OPINION OF THE COURT
Burton B. Roberts, J.
The defendants, indicted for murder in the second degree *451 and attempted robbery in the first degree in the shooting and killing of Joseph Thomas, have moved to suppress the in-court identification of themselves by witnesses for the People who participated in pretrial identification proceedings in this case. Following a lengthy hearing, the court has made the following findings of facts and reached the following conclusions of law.
Shortly after midnight on October 1, 1977 Shari Carter, a 14-year-old girl and her 20-year-old companion, Joseph Thomas, walked to the northwest corner of 148th Street and 7th Avenue, a short distance from Miss Carter’s apartment house on West 148th Street.
After they had been there a few minutes leaning against a car, Carter noticed three young Black men walking toward them on 7th Avenue.
One of these men, a dark-complexioned individual wearing a long gray coat and a gray "apple jack” hat walked to within three feet of Carter and Thomas. This man turned to Thomas and asked him if he had any "bank”. Joseph Thomas replied that he did not and the man in the grey coat turned to Carter. She saw that he had a gun in his hand, held chest high. Miss Carter stared at the man’s face. The man told Carter to go because "he [Joseph Thomas] was going to die.” Carter then left, walking around the armed man to her home on 7th Avenue. The street was well lit. She saw the other men nearby, one on the northwest corner of 148th Street and one in front of a nearby grocery store, but she did not get a good look at their faces. Carter estimated that the confrontations with the man with the gun lasted two minutes, but the court finds that it was less than a minute, around 15 to 30 seconds.
Carter testified that although she had trouble describing his individual features, she would, from her viewing of him at the scene, be able to recognize the man when she saw him.
Later that day, Carter was interviewed in her home by Detective William Lundun. She told him of the approach by the three men in a similar fashion to her testimony at this hearing.
On the very first day of the investigation, a number of people interviewed by Detective Lundun told him that Ivan Johnson and his "group” had shot Joseph Thomas.
Detective Lundun then assembled B.C.I. photographs of Ivan Johnson and Derek Ellis and four or five other individuals who were either alleged associates of Johnson or who *452 matched the general description of men who had been arrested for homicide in the area of the crime.
On October 2 Detective Lundun took these photographs and showed them to Carter in her apartment, with her family present. Lundun passed six or seven of these photographs to Carter. When he asked her if she recognized anybody, she shrugged her shoulders and did not pick out anybody. Johnson’s photo was among those shown to her at that time.
By October 5, 1977, Detective Lundun had completed a photo array which contained 12 photographs of young Black males. Included in this array were all of the photographs that Detective Lundun had brought to Carter’s house on October 2.
On October 12, 1977, Lundun showed the array to Alexander Cook, who immediately pointed out Johnson, Ellis and West by name as the men he recognized as being involved in the Joseph Thomas killing. Before viewing the photo array, Cook gave Lundun a statement stating that he had seen Derek Ellis and Leroy West at the killing.
On October 24, Shari Carter was brought to the sixth homicide zone, where she was shown the same photographic array that Cook had seen. The array was placed before her and she was asked if she recognized anyone in the folder as having been at the scene of the crime on October 1. Within seconds she picked out Ivan Johnson.
On November 14, 1977, arrest warrants charging the defendants with the murder of Joseph Thomas were issued and lodged at Hiker’s Island where the defendants were all pretrial detainees on other criminal matters.
On November 15, Detective Lundun arranged to have the defendants brought to the sixth homicide zone for a lineup. Shari Carter and Alexander Cook were separately brought down to the precinct where the lineup was to be held. The defendants requested the presence of an attorney, a Mr. Van Leer, who had represented them on prior occasions. The police contacted Mr. Van Leer, and a lawyer associated with his firm, Mr. Greenberg, came to the lineup.
Before conducting the lineup, the police decided to conceal the identities of Carter and Cook from Mr. Greenberg. This is an apparently routine practice (or, at least, not an unusual one) in homicide lineups conducted at the sixth homicide zone. Moreover, in this case the police investigation had revealed that the defendants had a reputation for violence in the *453 community where this crime occurred, and this reputation was known by both Carter and Cook. Indeed, Cook asked that his identity not be made known to the defense attorney. Additionally, Detective Lundun knew that a man named Robert Campbell, who, in October, 1977, had been a complainant in an armed robbery case, had identified Ivan Johnson and another man as the perpetrators of that crime. Johnson, who had allegedly told Campbell not to go to the police, was arrested. On October 30, 1977 (30 days after the alleged murder of Joseph Thomas), Robert Campbell was shot three times as he was about to enter his apartment. Derek Ellis was arrested for this killing before November 15,1977. The alleged motive for the killing was to eliminate Campbell as a witness against Ivan Johnson. (Since that time Ellis has been tried and convicted of murder in the second degree for killing Campbell and is presently serving a 25-year-to-life sentence.) The general facts of the Campbell killing were known by Cook and Carter and they were both fearful. The police also believed that there were other colleagues of Johnson, Ellis and West at liberty at the time of the lineup.
Thus, because of both the police custom and the violent, vindictive reputation of the defendants, the police decided to hang a sheet in the viewing room to separate the witnesses from the defendants’ attorney.
Greenberg was, however, allowed to arrange his three clients in the lineup and to pick the stand-ins. With Greenberg’s full participation, a lineup containing eight persons was arranged. Greenberg complimented the police on the quality of the stand-ins and there is no dispute in this record that the composition of the lineup was anything but fair. As to this portion of the lineup, the court agrees with the defendants’ counsel, who was present, that there was nothing about the composition of the lineup that would cause any of the defendants to be unfairly singled out.
After the stand-ins and the defendants were arranged in the lineup room, Greenberg went to the adjacent viewing room, which was separated from the lineup room by the familiar one-way mirror, which allows witnesses to view the lineup without themselves being seen.
Here, Greenberg was only allowed to stand in the doorway and was separated from the viewing area by a sheet which prevented him from seeing the witnesses, the viewing window and Detective Lundun, who stood alongside each witness as *454 they viewed the lineup. Also, from his vantage point in the doorway of the viewing room, Greenberg was unable to see the lineup room during the observations made by the witnesses.
Shari Carter was the first witness brought into the viewing room by Detective Lundun. She was apparently nervous and Detective Lundun reassured her that the men in the lineup could not see her. The curtain covering the viewing window was drawn and within seconds, Carter jumped back, trembling, and tried to leave the room. Detective Lundun grabbed her by the arm and tried to calm her down as she walked out of the viewing room by the concealed door from which she had entered. Outside the room Detective Lundun- told her that she had nothing to fear and that the men in the lineup definitely could not see her. This conversation took place out of the hearing and sight of Mr. Greenberg. After a few minutes had passed Carter was led back into the viewing room. Greenberg still remained on the other side of the linen curtain. The viewing window was uncovered, Carter looked through the window and the participants of the lineup each, one at a time, walked up to the window and turned sideways in front of it. Detective Lundun asked Carter if she recognized any of the persons in the lineup as being the person or persons whom she saw approach Joseph Thomas on the night he was shot. Without hesitation, Miss Carter picked out the defendant Ivan Johnson. She then left the room.
Alexander Cook was then brought into the viewing room, where he looked through the window at the stand-ins. He too was asked the same question as Miss Carter and he immediately picked out the defendants Johnson, Ellis, and West, stating that he had seen West punch Joseph Thomas and that he had seen Derek Ellis with a gun.
Cook was then led from the room. During the confrontations or, more properly, viewings by these witnesses, Greenberg remained some three to five feet away behind the sheet. Not only did he not learn the identity of the witnesses, but he apparently was unable to clearly hear Miss Carter’s responses. Also, because of this separation, Greenberg, whom this court finds quite credible, apparently became somewhat confused, even to the point of believing that there were three witnesses who viewed the lineup, instead of the actual number, which was two. The court finds that this confusion and uncertainty on the part of Greenberg was substantially due to his physical separation from the viewing witnesses.
*455 Another lineup was conducted with different witnesses at the District Attorney’s Office on January 6, 1978. Although testimony has been received concerning the conduct of this lineup, the District Attorney has stated that no person who viewed that lineup will make an in-court identification of any one of the defendants. Thus, it is not necessary to reach any determination on this lineup. However, the court wishes to note that the same procedure of screening the identity of the viewing witness from the defense attorney as well as preventing him from seeing the actual viewing was employed at the January 6 lineup.
During the course of the hearing, counsel for the defendants raised for the first time with the permission of the court, the claim that the defendants had been deprived of the effective assistance of counsel during the lineup.
SHARI CARTER
THE DUE PROCESS ARGUMENT
The defendant Johnson (the only defendant of whom Carter will be asked to make an in-court identification) claims that the pretrial identification procedures used here created a substantial risk of irreparable misidentification. The court does not find this claim persuasive. As the Supreme Court noted in Stovall v Denno (388 US 293, 302) "a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it”. Moreover, the display of photographs in groups to a witness during the investigative stage of a crime, has been considered and approved by the Supreme Court. "Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs. The danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method’s potential for error. We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement. Instead, we hold that each case must be considered on its own facts, and that convictions based on *456 eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. The standard accords with our resolution of a similar issue in Stovall v. Denno, 388 U.S. 293, 301-302, and with decisions of other courts on the question of identification by photograph.” (Simmons v United States, 390 US 377, 384.)
In this case, the initial photo array shown to Carter was no more suggestive than inherently is any group of photographs of possible suspects. The court does not find that the circumstances of this first photograph showing led or will lead to a substantial danger of misidentification of Johnson by Carter. In point of fact, Carter did not pick out Johnson’s photograph or any of the other photographs on October 2, 1977.
The second, somewhat more extensive photo array was shown to Carter at the sixth homicide zone on October 24, 1977. There, she picked out Johnson with no hesitation. Most of the photographs she had viewed on October 2 were included in this second array. Although it is true that Johnson’s photograph (as well as five or six others) was among those Carter was now seeing for a second time, this procedure was not, considering all of the circumstances, so suggestive as to be violative of due process. Compare Foster v California (394 US 440), which involved repeated one to one confrontations between a suspect and the manager of an office that had been robbed, and the far less suggestive procedure employed here. Thus, the court concludes that the cumulative effect of the two separate photographic arrays on October 2 and October 24 was not so suggestive as to be violative of due process.
Despite this, the People shall not be allowed to use evidence of photographic identification on their main case. (People v Christman, 23 NY2d 429; People v Cioffi, 1 NY2d 70.)
As far as the lineup procedure is concerned the court finds, with the exception of the partial denial of defendants’ right to counsel, that the proceeding was eminently fair. Defense counsel was promptly contacted and participated in the composition and arrangement of the lineup. Moreover, although he could not see the witnesses, he stood close enough to them that he could hear normal conversational speech (if the witnesses had spoken in conversational tones). Although the shielding procedure used here seems to be routinely employed *457 by the police (at least in the sixth homicide zone), there was also a genuine concern for the safety of the witnesses. The court concludes, nonetheless, that there was a measurable deprivation of the right to counsel here.
THE RIGHT TO COUNSEL ARGUMENT
At the time of the lineup, arrest warrants had been lodged against all three defendants. Formal criminal proceedings had commenced (CPL 1.20, subds 1, 17; see, contra, People v Torres, 63 AD2d 1003). Here, however, unlike Torres, the investigation was hardly preliminary and, as counsel for the People has conceded, the defendants had counsel and were entitled to the effective assistance of counsel at the lineup. This is certainly the spirit of the right to counsel decisional law in New York and in accord with People v Burwell (26 NY2d 331, 336) where the Court of Appeals held, in a prearraignment lineup "the failure to arrange for the presence at the lineup of a defendant’s lawyer, then seeking access to his client, is suggestive of a violation, in spirit at least, of the principles previously laid down by this court”. Later, in People v Blake (35 NY2d 331, 339), the Court of Appeals held that "in this State a criminal action begins with the filing of an 'accusatory instrument’ as defined by statute, which serves as the basis for prompt arraignment or issuance of a warrant of arrest”.
The right to counsel means, of course, the right to effective assistance of counsel. The dangers inherent in identification proceedings are too numerous and well known to be reviewed generally here. (See United States v Wade, 388 US 218, 228-233.) Indeed, one of the very dangers of lineups conducted in the absence of counsel is that a suspect, even unwittingly, may be pointed out before or during a lineup (388 US 218, 233). Further, the Supreme Court in Wade succinctly stated the preventive and corrective roles of defense attorneys at the identification proceeding (pp 230-232): "neither witnesses nor lineup participants are apt to be alert for conditions prejudicial to the suspect. And if they were, it would likely be of scant benefit to the suspect since neither witnesses nor lineup participants are likely to be schooled in the detection of suggestive influences. Improper influences may go undetected by a suspect, guilty or not, who experiences the emotional tension which we might expect in one being confronted with potential accusers. Even when he does observe *458 abuse, if he has a criminal record he may be reluctant to take the stand and open up the admission of prior convictions. Moreover, any protestations by the suspect of the fairness of the lineup made at trial are likely to be in vain; the jury’s choice is between the accused’s unsupported version and that of the police officers present. In short, the accused’s inability effectively to reconstruct at trial any unfairness that occurred at the lineup may deprive him of his only opportunity meaningfully to attack the credibility of the witness’ courtroom identification. ” *
In the context of this case, where much of the People’s case rests on the testimony of a 14-year-old girl’s nighttime encounter with the defendant Johnson, the need for careful scrutiny of the identification proceeding is graphically apparent.
It is also apparent that the measures taken by the police in this lineup, however well meaning, deprived Johnson of the effective assistance of counsel. Counsel could not see the moment of confrontation and, he could not hear it. Indeed, because of the procedure employed here, his recollection of the lineup is hopelessly confused. Even the cases cited by the People, principally United States v Tolliver (569 F2d 724), still require counsel present at the actual confrontation. (See, also, United States v Ash, 413 US 300.)
Nevertheless, the People contend that they have a right to protect the identity and safety of their witnesses and that the measures that the police employed at the lineup were consonant with this right and were not of such a scale as to deny the defendant Johnson of his right to counsel. This court is not so persuaded.
It is, of course, true that during the preliminary stages of criminal proceedings the People may wish to conceal the identity of some of their witnesses.
Indeed, it is hard to imagine a society that would not have this inherent power. However, the defendant’s right to counsel coexists with the right to protect witnesses and it cannot and need not be extinguished by it. Significantly, the Supreme Court considered this very problem in United States v Wade (supra, p 238, n 28) where it noted: "Concern is also expressed *459 that the presence of counsel will force divulgence of the identity of government witnesses whose identity the Government may want to conceal. To the extent that this is a valid or significant state interest there are police practices commonly used to effect concealment, for example, masking the face. ” (Emphasis added.)
Thus, a ready solution for the problem here had been suggested by the Supreme Court as far back as Wade. For whatever reason this, or an analogous measure, was not followed. Instead, Greenberg was as effectively separated from Detective Lundun and the witnesses as if he had been in West Nyack. This certainly was not envisioned by the Supreme Court in Wade when they noted (p 238): "In our view counsel can hardly impede legitimate law enforcement; on the contrary, for the reasons expressed, law enforcement may be assisted by preventing the infiltration of taint in the prosecution’s identification evidence. That result cannot help the guilty avoid conviction but can only help assure that the right man has been brought to justice.”
There may well be cases when varying methods may be employed to protect witnesses such as masking them, placing hoods over their head, or a sheet over their body. It is, however, the conclusion of the court that the approach taken here was so extreme that it amounted to the denial of the effective assistance of counsel. Evidence of the lineup on the People’s direct case must, therefore, be suppressed with respect to witnesses Carter and Cook. (Gilbert v California, 388 US 263, 272-273; Moore v Illinois, 434 US 220.)
INDEPENDENT SOURCE
The issue remaining before the court is whether the People have shown "by clear and convincing evidence that the in-court identifications were based on observations of the suspect other than the lineup identification.” (United States v Wade, 388 US 218, 240, supra.)
The standard to be applied was stated in Neil v Biggers (409 US 188, 199-200) where the court held: "As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness’ degree of attention, the accuracy of the witness’ prior description of the criminal, the level of certainty demonstrated by the *460 witness at the confrontation, and the length of time between the crime and the confrontation.” (Italics added.)
It is now clear that these standards apply to post-Stovall as well as pre-Stovall cases. (Manson v Brathwaite, 432 US 98, 114.)
Turning to the facts of this case the court finds that Carter observed the defendant for 15 to 30 seconds. The street was well lit, and the defendant Johnson stood no more than two to three feet from her.
Carter was no casual or passing observer, as so often is the case with eyewitnesses. She saw Johnson, with a gun in his hand, talking to the young victim, Joseph Thomas, who stood at her side. When Thomas demurred to Johnson’s request for money, Johnson turned directly to Carter and told her to leave, since Thomas was going to be killed (as indeed he was). She looked directly into Johnson’s face when he spoke and then walked around him and left.
While Carter’s description was generalized, this appears more to relate to her limited ability to articulate what she had seen rather than a deficiency in her powers of observation. While it is true that Carter did not pick out Johnson’s photograph on October 2, she did not pick out any of the other photos shown to her. She was also in her home, surrounded by her family, and, in the circumstances of this case, may have been understandably reluctant to involve herself in it.
Thus, when she was shown the nonsuggestive 12 person photo array on October 24, at the sixth homicide zone, Carter had no hesitation or doubt in picking out Johnson’s photograph as the man who had spoken to her on October 1. As previously noted, most of the photos shown to Carter on October 2 were incorporated into the photo array she saw on October 24, thus minimizing the suggestiveness of the repetition of Johnson’s photo.
Also, in reaching its determination of independent source, it is proper for the court "to consider those facts which, despite the absence of counsel, are disclosed concerning the conduct of the lineup.” (United States v Wade, 388 US 218, 241, supra.)
The court finds that when the viewing window was exposed Carter fearfully tried to bolt from the room. When she returned, after being reassured about her personal safety, she picked out Johnson without hesitation as the man who had approached her. Finally, in her testimony at the hearing *461 conducted at Johnson’s request, in his absence, the witness firmly testified that she would be able to recognize the man who had approached her. (People v Huggler, 50 AD2d 471.)
Based on all of the foregoing factors, the court concludes that the People have established by clear and convincing evidence that Carter’s proposed in-court identification is based on factors other than the tainted lineup identification. Thus, the motion to suppress the in-court identification of the defendant Johnson by Shari Carter is denied. However, to repeat, evidence of the lineup identification itself shall be excluded from the People’s case.
ALEXANDER COOK
THE LINEUP
For the reasons stated previously, evidence of the lineup shall be excluded on the People’s direct case.
INDEPENDENT BASIS FOR IN-COURT IDENTIFICATION
The evidence at the hearing conclusively established an independent basis for Cook’s in-court identification. As early as October 12, Cook told Detective Lundun that Johnson, Ellis and West were the men who had killed Joseph Thomas. He named them and immediately identified them when shown their pictures in a fair photo array by Detective Lundun. Cook stated that he had seen the killing clearly. He knew the victim and defendants for several years. They knew him. His identification could hardly, in these circumstances, have been the product of any taint that occurred in the lineup procedure used here. (See United States v Wade, 388 US 218, 241, n 33, supra.)
Thus, the motion to preclude the in-court identifications of the defendants by Cook is denied, but evidence of his lineup identification shall be excluded on the People’s case.

 Certainly in large urban areas such as this jurisdiction, it would be the better practice to have a lawyer present when a lineup is conducted even before the commencement of formal criminal proceedings. With a large Legal Aid staff and "18-B” panels — the mechanism for this to be worked out is far from administratively insurmountable.