(No. 65409.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. MARION HOLMES, Appellant.

*Opinion filed November 30, 1990.*

Steven Clark and Michael J. Pelletier, Deputy Defenders, and Debra R. Salinger and Barbara Kamm, Assistant Appellate Defenders, of the Office of the State Appellate Defender, of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley and Cecil A. Partee, State's Attorneys, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Inge Fryklund, James E. Fitzgerald, Patrick M. Brady and Renee Goldfarb, Assistant State's Attorneys, of counsel), for the People.

JUSTICE STAMOS delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, Marion Holmes, was found guilty of armed robbery (Ill. Rev. Stat. 1983, ch. 38, par. 18—2(a)) and was sentenced to 15 years' imprisonment. The appellate court affirmed (155 Ill. App. 3d 562). We granted defendant's petition for leave to appeal (107 Ill. 2d R. 315).

## FACTS

On March 23, 1980, two men robbed a McDonald's Corporation office in Chicago Heights of $13,000. The office operated as a clearinghouse for the receipts of eight McDonald's restaurants. Defendant was arrested for the crime in January 1982, after his alleged accomplice, Ulrich Williams, implicated him in the robbery.

Prior to trial, the State filed a motion to remove defendant's attorney, Leo Holt, from the case because of

a conflict of interest. Holt had previously represented Williams, the State's key witness, in various criminal matters. Defendant replied by filing a memorandum which alleged that no conflict existed and that, even if one did, he waived his right to conflict-free counsel. The court conducted a hearing on this motion, at which Holt admitted that from 1972 through 1978 he had represented Williams on several criminal charges, and that five years prior to the current proceeding he had had communications with Williams which would be covered by the attorney-client privilege. The trial court determined that a conflict of interest existed which was impossible to waive, and removed Holt from the case.

Defendant subsequently retained Isaiah Gant as his attorney. Gant then filed a motion to allow discovery of a statement Williams had made in an unrelated proceeding. The State objected to releasing the entire statement on the grounds that much of the material was irrelevant, and that much of the information in Williams' statement would jeopardize ongoing, unrelated investigations and endanger the safety of certain police informants. Over defendant's objection, the trial judge conducted an *in camera* inspection of the statement in the presence of the assistant State's Attorney and a court reporter. After considering the State's reasoning for excising certain portions of Williams' statement, the trial judge concluded that some of the disputed information could adversely affect informants in other cases and involved ongoing investigations or matters pending in other jurisdictions which were unrelated to the matter before the court. Thus, the trial court allowed the State to tender the statement to defendant with 12 sections excised. The trial court placed copies of the original and excised versions of Williams' statement under seal, along with the court reporter's transcript of the *in camera* proceeding, to allow for a reviewing court's scrutiny.

At trial, two eyewitnesses, Patricia Skalski and Sherry Van Kampen, both of whom were McDonald's employees, testified for the State. The testimony of these two witnesses regarding the events which took place during the robbery was generally consistent. The testimony regarding the physical descriptions of the robbers, however, varied somewhat. The witnesses' specific descriptions of defendant differed from a height of 5 feet 4 inches to 6 feet, a weight of 160 pounds to 230 pounds, and an age of 35 years to 45 years. Their descriptions of Williams differed from 5 feet 6 inches to 6 feet, 180 to 225 pounds, and 30 to 40 years. The record indicates that defendant was 47 years old on the date of the robbery.

Eighteen months after the robbery took place, both eyewitnesses were shown photographic lineups. They were shown two groups of photographs, each group containing seven photographs. One group contained a picture of defendant; the second contained a picture of Williams. Van Kampen picked defendant's and Williams' pictures out of their respective groups. She also later made an in-court identification of defendant. She further testified that both robbers wore ski masks and that, before they left the office, they removed them. According to Van Kampen, this allowed her to clearly see the perpetrator's face. While there was testimony from one of the investigating police officers that Van Kampen had stated that the two robbers "were similar in appearance, possibly brothers," she denied ever saying that the robbers looked alike or could have been brothers. Skalski, however, was unable to identify anyone from the photographs, and apparently also did not make an in-court identification of defendant.

Ulrich Williams testified for the State. He stated that he and defendant robbed the McDonald's office. Williams had confessed to the crime 18 months after the robbery

while in the custody of the Lake County, Indiana, police. He also identified himself and defendant from the same sets of photographs shown to Skalski and Van Kampen. His testimony also basically corroborated the eyewitnesses' testimony regarding the events which took place at the robbery: Both robbers wore ski masks and were armed. They removed their masks as they prepared to leave the office. Before they could leave, however, a group of motorcyclists in the parking lot compelled them to wait until they could escape unseen. This allowed Van Kampen the opportunity to view the robbers' faces. They then left the office and walked to their car at a leisurely pace so as not to attract attention.

Williams further testified that he had been convicted of various criminal offenses, including possession of a controlled substance and mail fraud. In exchange for Williams' agreement to testify against defendant, the State recommended, and Williams ultimately received, a six-year sentence for his participation in the McDonald's robbery. Williams also testified that his family had been relocated and had received $2,325 from the State for relocation expenses.

The jury found defendant guilty of armed robbery. Defense counsel Gant filed a motion for a new trial, to which defendant added an addendum. These documents alleged that Gant rendered ineffective assistance of counsel. Specifically, the motions alleged that Gant failed to pursue, on cross-examination, the possibility that Williams' brother, not defendant, was the other man who participated in the robbery.

Gant and defendant relied on two pieces of evidence to support the theory that Williams' accomplice was Williams' brother. The first was the testimony that Van Kampen had told an investigator that the two robbers were similar in appearance and could have been brothers. The second was Williams' testimony on cross-exami-

nation that some of his family members had been involved in the mail fraud scheme for which he had been convicted and that these family members had been convicted as well. According to Gant, these two bits of testimony "should have put counsel [Gant], *** on notice that a line of cross-examination regarding Ulrich Williams' brother, the description of the brother, the other criminal offenses that he and his brother were convicted or involved in, should have been pursued." The trial court denied the motions and sentenced defendant to 15 years' imprisonment. The appellate court affirmed. 155 Ill. App. 3d at 584.

## ANALYSIS

Defendant argues that the trial judge erred in ruling that attorney Holt had a conflict of interest, and that this ruling effectively denied defendant his constitutional right to his counsel of choice. Defendant further argues that the trial judge's refusal to release relevant discovery material violated defendant's constitutional right to confrontation and due process, that defendant was denied effective assistance of counsel because Gant failed to introduce critical evidence that the robbery was committed by Williams' brother, not defendant, and that defendant was not proven guilty beyond a reasonable doubt because the eyewitnesses' identifications were too varied to be trustworthy and because Williams' identification was tainted by a motive for lying. For reasons we shall explain below, we affirm the judgments of the lower courts.

### I

In his first contention, defendant argues that he was deprived of his constitutional right to counsel of choice when the trial court granted the State's motion to dis-

qualify attorney Holt on the ground that Holt had a conflict of interest which was impossible to waive.

The sixth amendment guarantees that, in all criminal prosecutions, the accused shall have the right to assistance of counsel. (U.S. Const., amend. VI.) This right was designed to assure fairness in the adversary criminal process. (*United States v. Morrison* (1981), 449 U.S. 361, 364, 66 L. Ed. 2d 564, 567, 101 S. Ct. 665, 667.) This constitutional guaranty encompasses both the right to effective representation by competent counsel (*People v. Johnson* (1979), 75 Ill. 2d 180, 185) and the right to select and be represented by one's preferred attorney (*Wheat v. United States* (1988), 486 U.S. 153, 159, 100 L. Ed. 2d 140, 148, 108 S. Ct. 1692, 1697; *Johnson*, 75 Ill. 2d at 185). This court has held that this right to effective assistance of counsel includes assistance by an attorney whose allegiance to the client is not diluted by conflicting interests or inconsistent obligations. (*People v. Spreitzer* (1988), 123 Ill. 2d 1, 13-14.) An accused may exercise the right to counsel of choice even where it jeopardizes the right to effective assistance of counsel if the accused makes a knowing, voluntary, and intelligent waiver of the latter right. See *Spreitzer*, 123 Ill. 2d at 17.

The sixth amendment right to choose one's own counsel is not, however, absolute. The right is "circumscribed in several important respects," which may include the disqualification of chosen counsel if a conflict of interest exists. (*Wheat*, 486 U.S. at 159, 100 L. Ed. 2d at 148-49, 108 S. Ct. at 1697.) The United States Supreme Court, in *Wheat*, described the role of counsel as follows:

> "[T]he purpose of providing assistance of counsel 'is simply to ensure that criminal defendants receive a fair trial,' *Strickland v. Washington*, 466 U.S. 668, 689 (1984), and \*\*\* in evaluating Sixth Amendment claims, 'the appropriate inquiry focuses on the adversarial process, not

on the accused's relationship with his lawyer as such.' *United States v. Cronic*, 466 U.S. 648, 657, n.21 (1984). Thus, while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers. See *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983); *Jones v. Barnes*, 463 U.S. 745 (1983)." *Wheat*, 486 U.S. at 159, 100 L. Ed. 2d at 148, 108 S. Ct. at 1696-97.

Having explained the general principles of an accused's right to counsel of choice, which the parties in the case at bar do not dispute, we turn to the law governing conflict-of-interest questions. Both parties cite numerous authorities in support of their respective positions. As the appellate court noted, however (155 Ill. App. 3d at 577), no authority exists which addresses the precise issue raised in this appeal: Did the trial court err in disqualifying an attorney because of the attorney's past, and possibly ongoing, professional relationship with the State's key witness, where all relevant facts were disclosed and defendant endeavored to waive any conflict of interest?

The State vigorously argues that a *per se* conflict of interest existed in the case at bar. Defendant just as vigorously argues that no conflict—*per se*, actual, or potential—existed. The appellate court in the case at bar "determined that a conflict existed." (155 Ill. App. 3d at 575.) However, after careful examination of all the authorities cited and argued by the parties, we find that none of the decisions of this court or the appellate court is directly applicable to the issue before us.

In *People v. Spreitzer* (1988), 123 Ill. 2d 1, this court examined the "confusing, and sometimes inconsistent use of such terms as '*per se* conflict,' 'potential conflict,' 'possible conflict,' 'actual conflict,' 'prejudice,' and 'ac-

tual prejudice' " in the cases which considered whether an attorney's conflict of interest affected an accused's right to effective legal representation. (*Spreitzer*, 123 Ill. 2d at 14.) The *Spreitzer* court determined that the term "*per se* conflict" only applied to a class of cases where the defense counsel had a tie to a person or entity which would benefit from an unfavorable verdict for the defendant. In these cases, there is no need to show that the attorney's actual performance was affected by existence of the conflict. The very existence of the conflict would inadvertently affect counsel's performance in ways difficult to detect and demonstrate, and would lead to the possibility that the attorney would be unnecessarily subject to charges that his representation was less than faithful. The *Spreitzer* court concluded that an accused need not show "prejudice" or "actual prejudice" in order to secure a reversal in this situation, unless the accused knowingly waived his right to conflict-free counsel. *Spreitzer*, 123 Ill. 2d at 14-17.

The court in *Spreitzer* went on to distinguish cases where a *per se* conflict exists from a second class of conflict-of-interest cases. These conflict cases generally, but not exclusively, involved joint or multiple representation of codefendants. In one type of case in this class, an attorney would bring the potential conflict to the trial court's attention at an early stage, creating a duty in the trial court to appoint separate counsel or determine if the risk of conflict were remote enough to leave the status quo undisturbed. Reversal of a conviction in a case of this type does not require a showing of "specific prejudice." (*Spreitzer*, 123 Ill. 2d at 17-18, citing *Holloway v. Arkansas* (1978), 435 U.S. 475, 55 L. Ed. 2d 426, 98 S. Ct. 1173.) In the second type of case in this class, the trial court is not apprised of the potential conflict. Reversal in this type of case will be proper only upon showing that an actual conflict existed which actually had an

adverse effect on counsel's performance. *Spreitzer*, 123 Ill. 2d at 18-19.

We conclude that none of the types of conflict cases explained in *Spreitzer* encompasses defendant's cause. This is because the posture of the case before us and, consequently, the nature of defendant's claimed constitutional deprivation have no relation to the analysis involved in this court's past conflict-of-interest decisions. Defendant claims that the trial court violated his right to counsel of choice, *not* that Holt's performance as defendant's attorney was ineffective.

In the typical conflict-of-interest case, the accused was represented at trial by counsel who allegedly labored under a conflict of interest. On appeal, the accused claims that the sixth amendment right to effective assistance of counsel was violated because of the conflict of interest. (*E.g., People v. Flores* (1989), 128 Ill. 2d 66, 83-86; *People v. Free* (1986), 112 Ill. 2d 154, 165-70.) Normally, to prevail on a claim of ineffective assistance, an accused must show prejudice. (See *Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064; *People v. Owens* (1989), 129 Ill. 2d 303, 309; *People v. Albanese* (1984), 104 Ill. 2d 504, 525-27.) However, when the claim of ineffective assistance constitutes an allegation of a conflict of interest, an accused need not always show prejudice. As we have said, prejudice is presumed where a *per se* conflict exists (*Spreitzer*, 123 Ill. 2d at 15), and in cases that this court has not labeled *"per se"* where the trial court is made aware of the conflict at an early stage of the trial (*Spreitzer*, 123 Ill. 2d at 18). If neither of these situations exists, it is the accused's burden to show that an actual conflict existed in order to establish prejudice. (*Flores*, 128 Ill. 2d at 84; *Free*, 112 Ill. 2d at 169.) But an analysis of whether prejudice is presumed or must be shown is simply not pertinent here, because defendant is

not claiming a violation of his right to effective assistance of counsel. Rather, he claims a violation of his right to counsel of choice. Because the trial court prevented Holt from representing defendant because of a disabling conflict of interest, this case obviously does not involve a claim that conflict-ridden counsel rendered ineffective assistance. Thus, the cases cited by both parties which discuss *per se* conflicts do not aid us in the resolution of defendant's claims.

For the same reason, *Free*, 112 Ill. 2d 154, heavily relied upon by defendant, is not dispositive. Defendant supports his position by quoting *Free:* "In a situation where defense counsel has represented a State's witness, a *per se* conflict of interest will not be held to exist unless the professional relationship between the attorney and the witness is contemporaneous with counsel's representation of the defendant. (*People v. Robinson* (1979), 79 Ill. 2d 147, 161; *People v. Strohl* (1983), 118 Ill. App. 3d 1084, 1092.)" *Free*, 112 Ill. 2d at 168.

In *Free*, the defendant claimed ineffective assistance of counsel based on an alleged conflict of interest, which, as we have said, is not the claim defendant here makes. The quoted language upon which defendant relies only states that, in situations where an accused's attorney has represented a State's witness, a *per se* conflict does not exist. The *Free* court then proceeded to analyze whether, in the absence of a *per se* conflict, defendant could prevail on the ineffective-assistance claim by demonstrating an actual conflict and prejudice. (*Free*, 112 Ill. 2d at 169-71.) Thus, *Free* is distinguishable from the case at bar because the sixth amendment right at issue in each case is not the same. Also, the *Free* court's determination that no *per se* conflict existed in that factual situation did not preclude the possibility that an actual conflict existed. Thus, even if *Free* did involve a claim such as is made in the present case, the language

defendant quotes is not dispositive of whether a conflict of interest existed or not.

Defendant attempts to bolster his claim by arguing that, had the trial court in this case found no conflict or had permitted defendant's waiver, yet defendant had been convicted, this court would not allow defendant on appeal to prevail on a claim of ineffective assistance of counsel. Assuming that defendant's hypothesis is correct, it does not dictate the result he urges in this court. We repeat that the differing postures of the case at bar and of defendant's hypothetical case dictate a conclusion that the constitutional right in each instance is different. That the two rights are not equivalent or coextensive is clear from the case law, which states that the right of effective assistance of counsel includes conflict-free counsel. (See *People v. Lewis* (1981), 88 Ill. 2d 429, 436.) Thus, a defendant who wishes to exercise the right to counsel of choice despite a conflict of interest must necessarily waive the right to effective assistance of counsel. While we have never been called upon to decide this issue, we think it is obvious that different standards of review apply to claims of ineffective assistance and to claims of denial of counsel of choice. Because the standards in ineffective-assistance claims are inapplicable to the case at bar, we now turn to discussions of the standard that does apply to defendant's claim.

The United States Supreme Court recently announced this standard in *Wheat v. United States* (1988), 486 U.S. 153, 100 L. Ed. 2d 140, 108 S. Ct. 1692. In *Wheat*, the accused, on the eve of trial, sought a substitution of counsel and requested that the attorney who represented two other defendants in the same drug-conspiracy case also represent him. After a hearing, the district court refused to allow the substitution, stating that an irreconcilable conflict of interest existed which could not be waived. The Ninth Circuit Court of Appeals af-

firmed, and the accused appealed. *Wheat*, 486 U.S. at 155-58, 100 L. Ed. 2d at 146-48, 108 S. Ct. at 1694-96.

The Supreme Court affirmed, holding:

"The District Court must recognize a presumption in favor of petitioner's counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict. The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court." *Wheat*, 486 U.S. at 164, 100 L. Ed. 2d at 152, 108 S. Ct. at 1700.

Defendant in the case at bar appears to believe that courts can always determine in a definite, precise manner whether a conflict or potential conflict of interest exists. However, *Wheat* makes it clear that the answer to this question is not always yes or no. The *Wheat* Court observed that a trial court must pass on the issue of whether to allow waiver of a conflict of interest "not with the wisdom of hindsight after the trial has taken place, but in the murkier pretrial context when relationships between parties are seen through a glass, darkly." (486 U.S. at 162, 100 L. Ed. 2d at 151, 108 S. Ct. at 1699.) For this reason, the *Wheat* Court concluded that a trial court "must be allowed substantial latitude in refusing waivers" not only where an actual conflict exists, but also "in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." (486 U.S. at 163, 100 L. Ed. 2d at 151, 108 S. Ct. at 1699.) The Court noted that the district court "relied on instinct and judgment based on experience in making its decision" and that it could not be said that the court "exceeded the broad latitude which must be accorded it in making this decision." (486 U.S. at 163, 100 L. Ed. 2d at 151, 108 S. Ct. at 1699.) The *Wheat* Court expressly recognized that "[o]ther district courts might have reached differing or

opposite conclusions with equal justification, but that does not mean that one conclusion was 'right' and the other 'wrong.' " (486 U.S. at 164, 100 L. Ed. 2d at 152, 108 S. Ct. at 1700.) In an instance like this, where the trial court must exercise discretion, a court of review will not find error or set aside a ruling of a trial judge unless there has been a clear abuse of discretion. See *People ex rel. Illinois State Dental Society v. Norris* (1979), 79 Ill. App. 3d 890, 901.

With these principles in mind, we turn now to the particular circumstances of this case. At the hearing on the State's motion to disqualify Holt, it was established that Holt represented Williams in 1972 on an armed robbery charge, which was dismissed. Holt also represented Williams sometime in 1977 or 1978 on a possession-of-stolen-motor-vehicle charge; Williams pleaded guilty and received probation. The prosecutor stated that Holt represented Williams in 1969 on a deceptive-practices charge. Holt responded that to the best of his recollection, he did not know Williams in 1969. Holt also represented Williams' brother during the 1970s.

One factual matter that is vigorously disputed by the parties concerns Holt's receipt of privileged communications from Williams. The following colloquy took place at the hearing:

"THE COURT: Have you spoken to him other than by leave of Court, at the occasion where he was brought out to the building in the past five years?

MR. HOLT: Oh, sure I have. *** I'm sure I have.

* * *

THE COURT: You have not had occasion—needless to say, I don't want to go into the content of that—but have you represented him on matters which, in fact, did not become the subjects of litigation?

MR. HOLT: I think a fair answer to that is—well, let me put it this way your Honor: I believe that we had conversations wherein I received information that is covered

by the attorney and client privilege, whether it resulted in representation of Mr. Williams or not."

The hearing took place in 1984. The robbery occurred in 1980. Thus, the "five years" referred to by the court would include the date of the robbery.

The State maintains, and the appellate court held, that Holt, in this discussion, "admitted receipt of privileged communications from [Williams] over a five-year period prior to trial." (155 Ill. App. 3d at 562.) We disagree. Holt's alleged admission is ambiguous at best. When Holt stated that he received privileged information, it is unclear whether he was referring to the specific five-year period that the trial court mentioned in the earlier question. In support of his argument that no conflict existed, defendant points to Holt's statement during the hearing: "[N]or has there been an attorney-client relationship with [Williams] for at least five years, maybe more." Nevertheless, leaving aside whether the communication in question was privileged, Holt clearly stated that he had spoken to Williams within the past five years. Therefore, in light of the ambiguous record, we agree with defendant that the appellate court erred in finding that Holt had admitted that he had received privileged communications from Williams during the five-year period prior to trial. (We note that the trial court did not make an express finding on this point.) However, we reach the same result as the appellate court and affirm its ruling that defendant was not improperly denied his constitutional right to choice of counsel.

The trial court expressly recognized that the right to counsel of choice is an important right. Yet, the court granted the State's motion to bar Holt for several reasons. An attorney owes his client complete loyalty, and Holt would have had divided or overlapping loyalties when he cross-examined Williams. Holt might have delib-

erately avoided questioning Williams about subjects that would conflict with his prior relationship with Williams. The court would have had to restrict the scope of cross-examination more than if Holt had not had a prior relationship with Williams. The State also has a right to have defendant represented by counsel who would not cross the bounds of propriety by cross-examining a critical State witness regarding matters which were the subject of a prior attorney-client relationship. (155 Ill. App. 3d at 572-73.) Further, the trial court expressed concern with the appearance of impropriety, should the jurors become aware, as they undoubtedly would, of Holt's prior representation of the State's key witness.

It is apparent that, in reaching its decisions, the trial court took into consideration the various competing interests at stake. As the Supreme Court stated in *Wheat*, we cannot say that "the court exceeded the broad latitude which must be accorded it" (*Wheat*, 486 U.S. at 163, 100 L. Ed. 2d at 151, 108 S. Ct. at 1699) in barring Holt from acting as defendant's attorney. Williams was the State's key witness. Holt's relationship with the witness was long-standing, dating back at least 12 years prior to trial. Although the record is ambiguous regarding the specifics of that relationship, to conclude that the likelihood that Holt and Williams had an ongoing relationship was so great as to barring Holt from representing defendant was not a clear abuse of discretion. Holt had also represented Williams' brother. The record might fairly lead to the conclusion that Holt was the "house counsel" for the Williams family.

Under these circumstances, the trial court's concern that Holt's cross-examination of Williams would be improperly restricted, and the adversarial process frustrated, is certainly justified. In fact, Holt admitted that he would voluntarily restrict his cross-examination to those matters that were of public record. We believe this

sort of restriction might have violated Holt's duty to represent his client with undivided loyalty. (See generally 107 Ill. 2d Rules 5—105, 5—107, 7—101.) Moreover, the trial court aptly noted the practical difficulties Holt would face in simultaneously attempting to fulfill his duties to both Williams and defendant. The trial judge stated that he had "no doubt that Mr. Holt would make every effort to fulfill his professional responsibilities" but that "delineation of where those responsibilities end for Mr. Ulrich Williams and begin for Mr. Holmes would be virtually impossible for any attorney to carefully draw or maintain." In short, defendant's interests would be jeopardized by Holt's continued representation of him.

At the same time, as the trial court noted, the State has a right to a fair trial. Defendant may have wanted Holt to represent him precisely because of Holt's relationship with Williams. Holt no doubt knew more about Williams than a lawyer with no prior connection with Williams. This knowledge potentially would have given defendant an unfair advantage. See *United States v. O'Malley* (7th Cir. 1986), 786 F.2d 786, 790-91; *United States v. James* (2d Cir. 1983), 708 F.2d 40, 45.

Finally, the trial court properly took into account the probability that, had the court accepted defendant's waiver of conflict-free counsel and had defendant then been convicted, he would have appealed, claiming ineffective assistance of counsel based on Holt's conflict of interest. See *Wheat*, 486 U.S. at 161, 100 L. Ed. 2d at 150, 108 S. Ct. at 1698 (noting "the legitimate wish of district courts that their judgments remain intact on appeal").

Defendant vehemently argues that the *Wheat* case is factually distinguishable from the case at bar, in that it involved an attorney's multiple representation of defendants charged in the same criminal conspiracy. (See *Wheat*, 486 U.S. at 160, 100 L. Ed. 2d at 149, 108 S. Ct.

at 1697 (courts treat multiple-representation cases with special care because of grave potential for conflicts of interest).) While *Wheat* did involve the multiple representation of simultaneously charged defendants, we find nothing in the *Wheat* opinion that indicates its holding is limited to such cases. In the absence of such an indication, as well as the absence of authority from this court on the issue, we adopt the *Wheat* abuse-of-discretion standard as the standard applicable to claims of violation of the right of choice of counsel. We note in passing that, prior to *Wheat*, other jurisdictions applied the abuse-of-discretion standard in reviewing such claims. (*O'Malley*, 786 F.2d at 793; *James*, 708 F.2d at 45.) We further note that the Seventh Circuit Court of Appeals has rejected a *per se* disqualification rule, even where an actual conflict exists, in favor of a balancing test. *O'Malley*, 786 F.2d at 790.

For these reasons, we find that the presumption in favor of defendant's counsel of choice was overcome by a showing of a serious potential for conflict. (See *Wheat*, 486 U.S. at 164, 100 L. Ed. 2d at 152, 108 S. Ct. at 1699-1700.) Accordingly, we hold that defendant's constitutional right to choice of counsel was not violated when the trial court disqualified Holt from representing defendant because of Holt's prior representation of the State's key witness.

## II

Defendant also argues that the trial court erred in refusing to release the complete transcript of Williams' statement, which Williams had made during a separate proceeding. Defendant states that his counsel has never been allowed access to the excised portions of Williams' statement and, because his counsel was not present during the *in camera* inspection of Williams' statement, that there has never been an adversarial setting in which

defendant could argue the relevance of the excised material. Defendant contends that this violated his constitutional rights to confrontation and due process.

The appellate court affirmed the trial court's decision not to allow defendant access to the excised portions of Williams' statement. The court expressly disapproved of the trial court's procedures in editing the irrelevant matters from the statement, holding that both sides should either be totally included or totally excluded from the *in camera* proceeding. However, the court ultimately held that this error was harmless because the excluded material was unrelated to defendant's cause. 155 Ill. App. 3d at 580-81.

Due process requires that the State disclose all evidence that is relevant to an accused's guilt or punishment. (*Brady v. Maryland* (1963), 373 U.S. 83, 87, 10 L. Ed. 2d 215, 218, 83 S. Ct. 1194, 1196-97.) This does not mean, however, that the State must turn over all evidence in its possession to an accused. (See *People v. Velez* (1984), 123 Ill. App. 3d 210, 216-19.) An accused is entitled to production of statements in the State's possession, provided no privilege exists and the relevancy of the evidence is established. (107 Ill. 2d Rules 412(c), (h), (i); *People v. Wolff* (1960), 19 Ill. 2d 318, 327.) Where the State objects to disclosure of such evidence because it does not relate to the accused's case, the trial judge has discretion to delete unrelated materials before delivery of a document to the accused. 107 Ill. 2d Rules 415(d), (e); *Wolff*, 19 Ill. 2d at 327.

We agree with defendant and the appellate court that the procedures the trial court used were inappropriate. (*People v. Coates* (1985), 109 Ill. 2d 431, 437-38.) Having both parties' attorneys present is preferable, for, in the event the court determines that a discovery privilege exists, the opposing party has the opportunity to argue for

the relevance of the excluded evidence. See *People v. Dace* (1983), 114 Ill. App. 3d 908, 915.

However, the error of excluding defendant's attorney from the *in camera* hearing was not reversible error. The reason the State sought excision of portions of the Williams statement was to keep information regarding unrelated, ongoing criminal investigations from reaching the public, and to protect the names of informants in those cases. (155 Ill. App. 3d at 580; see 107 Ill. 2d R. 412(i) (court may deny disclosure if "it finds that there is substantial risk to any person of physical harm, intimidation, bribery, economic reprisals, or unnecessary annoyance or embarrassment resulting from such disclosure which outweighs any usefulness of the disclosure to counsel").) Defendant argues that all relevant evidence must be disclosed by the State, even if such disclosure would be attended by potential danger to the reputation or safety of third parties. (*Alderman v. United States* (1969), 394 U.S. 165, 181, 22 L. Ed. 2d 176, 191, 89 S. Ct. 961, 970.) However, after careful examination of the excised portions of Williams' statement, we determine that all the material which the trial court refused to release to defendant has no relevance to defendant's cause. The *Alderman* Court stated that "[m]aterial not arguably relevant would not be disclosed to any petitioner"—even if such material contained no threat of injury to third parties. (*Alderman*, 394 U.S. at 181 & n.13, 22 L. Ed. 2d at 191 & n.13, 89 S. Ct. at 971 & n.13.) Because the excised portions are irrelevant to defendant's case, whether defendant's attorney was present during the *in camera* hearing would have had no effect on the trial judge's decisions in editing Williams' statement. Thus, the trial court's refusal to release this material to defendant's counsel was correct.

Defendant further argues that his attorney on appeal must be allowed to examine the excised material in or-

der to argue its relevance before this court. While the *Coates* decision argues either for the inclusion of counsel for both parties during an *in camera* proceeding, or for the trial judge to conduct the *in camera* hearing with neither attorney present, it in no way requires that defense counsel be allowed to examine the disputed material. Such a requirement would defeat the purpose of an *in camera* examination. (155 Ill. App. 3d at 581; *People v. Jackson* (1986), 145 Ill. App. 3d 626, 639.) Thus, even if the trial court had allowed defendant's attorney to be present at the *in camera* proceedings where it edited Williams' statement, neither defendant nor his attorney had a right to examine the excised portions of Williams' statement in order to prepare his appeal.

## III

In oral argument before this court, defendant originally asserted that the trial court should have mandated Gant's withdrawal as defendant's attorney because Gant was laboring under a conflict of interest when arguing his own incompetence during the hearing on the post-trial motions. We determined, however, that the issue of Gant's alleged conflict of interest turned on whether the attorney had actually rendered ineffective assistance of counsel in his representation of defendant. Therefore, we entered a supervisory order, remanding the cause to the circuit court for the limited purpose of an evidentiary hearing on the issue of Gant's ineffectiveness, while retaining jurisdiction. 107 Ill. 2d Rules 315, 383.

At this hearing, Gant testified that he had planned to pursue a misidentification defense on defendant's behalf at trial, based on the discrepancies in the eyewitnesses' testimony describing defendant, the supposed statement of witness Van Kampen that the two men who robbed the McDonald's office could have been brothers, the physical similarities between Williams and his brother

Reginald, and the history of prior criminal activity in which Williams had been involved with his brother. Gant stated that he had planned to use this evidence to prove that it was unlikely that defendant had committed the crime, but rather Williams' accomplice had been his brother, Reginald.

Gant stated that he had planned to pursue this theory when he cross-examined Williams regarding the prior crimes in which he had been involved with his brother. However, Gant testified that he somehow was sidetracked while questioning Williams, and never returned to the subject. He did not realize his failure to elicit this evidence until after the closing arguments had begun. At that point, Gant determined that it was too late to pursue the matter. Gant explained that this oversight was not a conscious decision. He further stated that in light of the differences in the descriptions given by the eyewitnesses, he believed this line of questioning would have had some bearing on the outcome of the trial, particularly if he had been able to connect it to the supposed statement by Van Kampen about the two robbers' looking like brothers.

On cross-examination, Gant admitted that Van Kampen's supposed statement had been presented to the jury at trial. However, he retorted that, because of his own oversight, he was unable to establish a connection between Williams and his brother. Gant also noted that the jury never heard any evidence regarding the actual existence of Williams' brother or the allegation that Williams had previously committed crimes with his brother. With these allegedly critical pieces of evidence, Gant said that he could have argued in closing that Reginald Williams, not defendant, committed the crime. He insisted that his failure to introduce this evidence was so significant that he felt compelled to raise his own ineffectiveness in the post-trial motion.

The trial court held, however, that Gant's performance in cross-examining Williams was excellent. The court noted that the evidence the jury took into consideration included the eyewitnesses' descriptions and identifications, as well as the testimony about the statement that the robbers looked like brothers. The court also emphasized Gant's cross-examination techniques which impeached Williams' credibility, and the fact that the jury received an accomplice-testimony instruction. (See Illinois Pattern Jury Instructions, Criminal, No. 3.17 (2d ed. 1981) (instructing jurors to consider the testimony of an accomplice with suspicion and caution in light of the other evidence).) The court concluded that implicit in a misidentification defense is the notion that "someone else did it," and the failure to present the specific inference that Williams' brother was the actual accomplice was woefully short of being the type of testimony that may have changed the outcome of· the case. Therefore, the court determined that Gant's performance in cross-examining Williams and the eyewitnesses was not deficient, and that the omission of the evidence suggesting Reginald Williams' connection to the crime had no effect on the outcome of the case.

We agree. To prevail on a claim of ineffective assistance of counsel, a claimant must show that the performance of the attorney fell outside the range of competence demanded of attorneys in criminal cases and that there is a reasonable probability that, but for the attorney's professional errors, the result in the case would have been different. (*People v. Barrow* (1989), 133 Ill. 2d 226, 247.) We must note, however, that claims of ineffectiveness can often be disposed of on the ground that the accused suffered no prejudice from the claimed errors, without deciding whether the alleged errors were egregious enough to constitute professional incompetence. (*People' v. Caballero* (1989), 126 Ill. 2d 248, 260, citing

234

*Strickland v. Washington* (1984), 466 U.S. 668, 695, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2069.) In *Caballero*, we stated that many defendants who make claims of ineffective assistance of counsel often attempt to reverse this procedure, dwelling heavily on their counsel's performance while making little attempt to demonstrate a reasonable probability that, absent the alleged deficiencies, the jury would have entertained a reasonable doubt as to the accused's guilt. *Caballero*, 126 Ill. 2d at 260-61.

This is exactly the circumstance in the case at bar. The trial record and the record of the proceeding conducted pursuant to our supervisory order reveal that Gant's failure to cross-examine Williams regarding his prior criminal activity with his brother would have had no effect on the outcome of the trial.

We first note that the cross-examination of the eyewitnesses, particularly Van Kampen, had no bearing on this issue whatsoever. All Gant could have hoped to accomplish by cross-examining Van Kampen regarding her supposed statement to the police officer that the robbers looked like brothers was her impeachment as a witness. The record shows that Gant did indeed ask this question; Van Kampen simply denied making the statement. Because the police officer was unavailable to testify, Gant had the police officer's statement introduced through stipulation. This, combined with Gant's cross-examination of Van Kampen regarding the disparity in her physical descriptions of the robbers, accomplished all Gant could have achieved through Van Kampen's testimony in establishing the misidentification defense—revealing any doubts regarding Van Kampen's identification of defendant. The jury was fully apprised of this evidence—including Van Kampen's in-court identification of defendant as the man who, along with Williams, robbed the McDonald's office on March 23, 1980. Also, the jury had the opportunity of viewing defendant and Williams them-

selves to see if Van Kampen's "brother" description had credibility, at least as far as defendant's appearance was concerned. We determine that any ability to introduce a more concrete connection between Williams and his brother through Van Kampen's testimony would have had no effect on the outcome of the trial.

The record also supports a similar conclusion regarding Gant's alleged failure to cross-examine Williams regarding his brother. Leo Holt also testified at the hearing conducted pursuant to our supervisory order. Holt explained that had he been allowed to represent defendant at trial, he would never have attempted the "brother" misidentification defense because the eyewitness descriptions of Williams and his accomplice made such a proposed strategy absurd. For example, Holt explained that both witnesses had described one of the robbers as being taller, while Reginald and Ulrich Williams were approximately the same size. He further stated that there were other discrepancies that caused him to believe that the description of the two robbers could not have fitted the similarities which existed between the two brothers. Finally, Holt stated that there was almost no physical resemblance between Reginald Williams and defendant. Holt explained that he would have pursued the misidentification defense from the standpoint of the robbery victims' not having had a fair opportunity to view the robbers and would have argued that Van Kampen's positive identification of defendant was therefore a mistake.

Gant's testimony at the hearing revealed that his main focus during cross-examination of all the State's witnesses was to discredit their testimony. As we have already explained, he made the best of his opportunities to discredit Van Kampen. The record shows that Gant's skillful cross-examination of Williams clearly alerted the jury to Williams' biases and motives regarding his rela-

tionship to and preferred treatment by the State. Gant was able to show the jury Williams' duplicitous nature through revealing his use of aliases, his lifelong pattern of using falsehood and inaccuracy to protect his own interests, and his past criminal record. In ruling that Gant's counsel had been not only effective, but excellent, the trial judge commented, "I shall never forget *** when [Gant] started *** his cross examination of Ulrich Williams by referring to [his many aliases. The State's Attorney] was sinking in his seat, due to the effectiveness of it. *** [T]he jury was on the edge of their collective seats. *** [O]ver the years [I] have made reference to the fact [that the young attorneys present in the courtroom that day] have made reference to the fact they felt it was the most effective cross examination of a ['flipper' (a defendant who becomes a State's witness)] that they had seen."

The record therefore clearly shows that, despite his alleged omission, Gant effectively impeached Williams' credibility. Defendant's speculations as to what would have transpired at trial had Gant raised these questions on cross-examination falls short of raising a reasonable probability that the result would have been different. In the case at bar, the description of what took place at the robbery is corroborated by two eyewitnesses and Williams, the accomplice. This helps give credibility to their testimony, despite Gant's skillful impeachment of these witnesses. Also, Van Kampen positively identified both Williams and defendant as the robbers on two separate occasions. As we will discuss in the next section of the opinion, it is the jury's province to determine the weight given to this evidence. While the eyewitnesses' descriptions of Williams and defendant varied greatly, we can glean from the record that the two robbers were physically dissimilar. The jury could itself view Williams and defendant together and see that they were indeed physi-

cally dissimilar. The photographs in evidence at trial and the testimony of Holt at the hearing conducted pursuant to our supervisory order conclusively show that Williams and his brother were physically similar, while defendant and Williams' brother were not. Therefore, we conclude that the evidence would not have led to a conclusion that Gant's "brother" theory was credible, and that there was no reasonable probability that the result of the trial would have been different had this "theory" been introduced.

Thus, the issue of whether Gant's alleged errors constituted professional incompetence is immaterial. An error by counsel, even if professionally unreasonable, does not warrant setting aside a criminal judgment based on ineffective assistance of counsel if the error had no effect on the judgment. (*People v. Bivens* (1987), 163 Ill. App. 3d 472, 480.) Because we find that this allegedly erroneous omission would have had no effect on the trial's outcome, we affirm the judgment of the trial court that defendant failed to show ineffective assistance of counsel.

## IV

Defendant also argues that he was denied his constitutional right to a fair trial because the State failed to prove him guilty beyond a reasonable doubt. Defendant contends that the descriptions and identifications were inherently untrustworthy in that the eyewitnesses' descriptions of the offenders varied greatly and the accomplice testimony was tainted by Williams' desire both to put himself in a favorable light with the State and to protect his brother.

Specifically, defendant points to the allegedly wide variance between the physical descriptions of the robbers given by Van Kampen and Skalski. The witnesses' specific descriptions of defendant differed from a height of

5 feet 4 inches to 6 feet, a weight of 160 to 230 pounds, and an age of 35 to 45 years; of Williams, from 5 feet 6 inches to 6 feet, from 180 to 225 pounds, and from 30 to 40 years. Defendant points to further discrepancies in certain statements of these witnesses which specifically described defendant as being substantially younger, shorter, and thinner than Williams. Additionally, the two witnesses disagreed regarding the color of defendant's clothing, and whether he had been wearing a fur coat or a Windbreaker.

Further, defendant claims that he was not proved guilty beyond a reasonable doubt because Williams was offering his testimony in exchange for a lesser sentence. Defendant also opines that Williams was lying to cover for his brother, who actually committed the crime. This allegedly makes Williams' testimony inherently unreliable.

We cannot agree. The due process clause of the fourteenth amendment (U.S. Const., amend. XIV) safeguards an accused from conviction unless the State has proved beyond a reasonable doubt every fact necessary to constitute the crime with which the accused is charged. (*People v. Young* (1989), 128 Ill. 2d 1, 48, citing *In re Winship* (1970), 397 U.S. 358, 364, 25 L. Ed. 2d 368, 375, 90 S. Ct. 1068, 1072-73.) When the sufficiency of the evidence is challenged, it is this court's function to carefully examine the evidence while giving due consideration to the fact the court and jury saw and heard that evidence. If, after such consideration, this court is of the opinion that the evidence is not sufficient to remove all reasonable doubt of the accused's guilt and is not sufficient to create an abiding conviction that the accused is guilty of the crime charged, then the criminal conviction must be reversed. *Young*, 128 Ill. 2d at 48.

Relying on United States Supreme Court precedent, this court articulated the proper standard of review to

be applied when an accused claims to have been convicted upon insufficient evidence:

" '[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." [Citation.] Instead, *the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.* [Citation.] This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence is to be considered in the light most favorable to the prosecution.* The criterion thus impinges upon "jury" discretion only to the extent necessary to guarantee the fundamental protection of due process of law.' (Emphasis added.)" *Young*, 128 Ill. 2d at 49, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573-74, 99 S. Ct. 2781, 2788-89.

A careful view of the record in the light most favorable to the prosecution convinces us that a rational fact finder easily could have found defendant guilty of armed robbery beyond a reasonable doubt.

First, Van Kampen's identification of defendant is reliable. When this court assesses the reliability of an identification, the relevant factors we consider are: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the

criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *People v. Slim* (1989), 127 Ill. 2d 302, 307-08; *People v. Manion* (1977), 67 Ill. 2d 564, 571, quoting *Neil v. Biggers* (1972), 409 U.S. 188, 199, 34 L. Ed. 2d 401, 411, 93 S. Ct. 375, 382.

Van Kampen had two opportunities for an unobstructed view of the criminal's face at the time of the robbery. (155 Ill. App. 3d at 568.) Van Kampen's testimony regarding the facts surrounding these opportunities was corroborated by Williams. (155 Ill. App. 3d at 569.) There is nothing in the record to show that Van Kampen's degree of attention during these opportunities was inadequate; on the contrary, her detailed description of how she beheld the criminal's features belies any claim otherwise. The record reveals that Van Kampen was completely certain that defendant was one of the men who had robbed the McDonald's office when she positively identified defendant from a photographic lineup.

Defendant argues that the remaining two identification factors mentioned in *Slim*—prior accuracy in description, and time lapse between crime and identification—weigh so heavily in his favor as to warrant reversal. Specifically, defendant points to the wide variance between both witnesses' descriptions of the criminal immediately after the crime and 18 months later when the identification was made.

We feel that the failure of Van Kampen and Skalski to precisely describe defendant's height, weight, and age does not create a reasonable doubt of his guilt. Generally, discrepancies as to physical characteristics are not fatal, but simply affect the weight to be given the identification testimony. Variances between a witness' trial testimony and pretrial statements raise questions of credibility which the trier of fact must assess in making a

determination of guilt. The presence of discrepancies in a witness' description of the accused do not in and of themselves generate a reasonable doubt as long as a positive identification has been made. (*Slim*, 127 Ill. 2d at 308-09; see *People v. Miller* (1964), 30 Ill. 2d 110, 113 (precise accuracy in describing facial characteristics unnecessary where identification is positive); *People v. Bias* (1985), 131 Ill. App. 3d 98, 104-05 (witness' failure to describe defendant's hair length, missing teeth, and facial scar were minor omissions); *People v. Harrison* (1978), 57 Ill. App. 3d 9, 14-15 (witness' failure to identify type or color of clothing of accused irrelevant where identification is otherwise positive).) Considering that very few persons are keen or trained observers and considering the stress under which the impressions of Skalski and Van Kampen were formed, discrepancies such as these are not uncommon. *Slim*, 127 Ill. 2d at 311.

For example, in *People v. Evans* (1962), 25 Ill. 2d 194, 200-01, this court held that a 5½-inch, 25-pound inaccuracy in a description of the accused was not decisive in light of the witness' positive identification. The *Evans* court concluded that because the jury heard the testimony and saw the accused in court, the jury was in a far better position to evaluate the weight to be given to the witness' discrepancies. Similarly, in *People v. Slim*, this court determined that a 6-year, 6-inch, 30-pound inaccuracy, combined with the witness' failure to remember the accused's teeth braces and unusually thick lips, was not decisive, also because of a positive identification. (*Slim*, 127 Ill. 2d at 305-06, 312-13.) The case at bar is remarkably similar. The jury was in an infinitely better position than we to judge the significance and weight of Skalski's and Van Kampen's testimony.

The defendant also argues that the large lapse of 18 months between the crime and the identification of defendant supports his claim that the identification is un-

reliable. While this large time lapse might be significant, it only goes to the weight of the testimony, making it a question for the jury. The fact that much of Van Kampen's testimony was corroborated by Williams only serves to strengthen her credibility. (*People v. Rodgers* (1972), 53 Ill. 2d 207, 214.) This court has upheld a criminal conviction where there was a two-year time lapse between the crime and the identification. (*Rogers*, 53 Ill. 2d at 214; see *People v. Dean* (1987), 156 Ill. App. 3d 344, 352 (identification made 2½ years later).) Viewing the record in the light most favorable to the State, we determine that, because of the strength of Van Kampen's positive identification, the 18-month time lapse has no significance.

Defendant's attack on Williams' testimony as unreliable because he admitted to being an accomplice also fails. The testimony of an accomplice witness "has inherent weaknesses, being testimony of a confessed criminal and fraught with dangers of motives such as malice toward the accused, fear, threats, promises or hopes of leniency, or benefits from the prosecution." (*People v. Hermens* (1955), 5 Ill. 2d 277, 285.) Because of this, accomplice testimony must be cautiously scrutinized on appeal (*People v. Ash* (1984), 102 Ill. 2d 485, 493), and these "inherent weaknesses" affect questions of the weight of the evidence and the credibility of the witness, matters peculiarly within the province of the trier of fact (*People v. Hansen* (1963), 28 Ill. 2d 322, 332). Material corroboration of an accomplice's testimony is entitled to great weight. (*People v. Baker* (1959), 16 Ill. 2d 364, 370.) However, the testimony of an accomplice witness, whether corroborated or not, is sufficient to sustain a criminal conviction if it convinces the jury of the defendant's guilt beyond a reasonable doubt. *Young*, 128 Ill. 2d at 48.

The record shows that Gant's cross-examination of Williams at trial revealed infirmities in Williams' testimony. Williams admitted his involvement in past crimes, most notably an insurance fraud scheme, a drug charge, and motor vehicle theft. He admitted the "deal" he worked out for the armed robbery charge in the instant case, where he would receive a six-year sentence and relocation expenses for his family. Further, Williams' description of the events of the robbery was substantially corroborated by the testimony of Skalski and Van Kampen.

We therefore conclude that the record in the case at bar upholds the reliability of Williams' accomplice testimony. The jury was fully apprised of Williams' criminal background, the evidence and testimony which impeached his testimony, and the negotiated plea agreement. The jury considered these factors along with the substance of Williams' testimony in light of the rest of the evidence presented at trial. It was the function of the jury to assess the credibility of the witness, the weight given to his testimony, and the inferences to be drawn from this evidence. The jury was also to resolve any conflicts in the evidence. We therefore refuse to reverse defendant's conviction on questions involving the credibility of an accomplice witness where the evidence is not so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt as to defendant's guilt. *Young*, 128 Ill. 2d at 51.

As for the argument that Williams' testimony is unreliable because he was lying to cover for his brother, we have already discussed how the record confirms that even had defendant's "brother" theory been presented to the jury, this argument would not have had a reasonable probability of changing the result of the trial. Also, the jury did hear evidence of defendant's prior criminal activity with his family members, most notably the insur-

ance fraud scheme. We have also discussed how the credibility of a witness is for the jury to decide, and that, through Gant's effective cross-examination, the jury was fully apprised of Williams' conflicting motives. The only credible strategy defendant had was to discredit the testimony of those who identified him as one of the robbers. While defendant's attorney did in fact impeach the identification testimony, there was substantial corroboration of Van Kampen's, Skalski's, and Williams' testimony regarding the events of the robbery, and both Williams and Van Kampen positively identified defendant as Williams' accomplice in the McDonald's armed robbery. The jury apparently gave this testimony great weight. We therefore conclude that the questions involving a misidentification defense and Williams' alleged attempts to shield his brother are insufficient to aid defendant's case.

For the foregoing reasons, the judgment of the appellate court is affirmed.

*Judgment affirmed.*