THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KENYATTA WHITE, Defendant-Appellant.

First District (6th Division) No. 1—06—1034

Opinion filed July 31, 2009.—Rehearing denied December 1, 2009.

Ralph E. Meczyk, of Law Office of Meczyk, Goldberg, and Richard M. Goldwasser, of Schoenberg, Finkel, Newman & Rosenberg, LLC, both of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (James E. Fitzgerald and Ljubica D. Popovic, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE O'MALLEY delivered the opinion of the court:

Following a bench trial, defendant Kenyatta White was convicted of first degree murder for the shooting death of Aramein Brown and

was sentenced to 55 years' imprisonment. Defendant appeals the judgment of the circuit court alleging that he was denied his sixth amendment right to counsel when the circuit court denied co-counsel leave to file an appearance on his behalf and where police barred defendant's attorney from observing witnesses identify defendant in a lineup. For the reasons that follow, we affirm the judgment of the circuit court.

## BACKGROUND

On January 6, 2003, Aramein Brown was shot to death at a gas station in Chicago, Illinois, at the corner of 79th Street and Yates Avenue. The Chicago police and the Cook County State's Attorney's office commenced an investigation shortly after the shooting and spoke to several witnesses to the occurrence. Defendant was arrested in East St. Louis, Illinois, on February 20, 2003, pursuant to a warrant and held on $1 million bond.[1] He was subsequently tried and convicted of first degree murder in a bench trial.

The evidence at trial consisted of eyewitness testimony of the shooting and an alibi defense offered by defendant supported by the testimony of two individuals. Between the initial statements given by witnesses and the testimony at trial, the only consistent aspects of the occurrence were that a man approached the victim at the gas station on 79th and Yates and shot him several times, ran southbound on Yates to a car and sped away. Beyond these few facts, very little of the eyewitness testimony is consistent.

On the day of trial, attorney Frank Himel moved for leave to file an appearance on behalf of defendant. The State objected to his motion for leave to file an appearance based on a conflict of interest. The State advised the court that Himel previously represented several members of the victim's family, including David Jennings, a cousin of the victim. Jennings allegedly identified defendant as Aramein's killer to federal authorities in an interview with Drug Enforcement Administration (DEA) agents where Himel was present and represented Jennings. Defense counsel and Himel argued in response that the State had not identified any individual who would be called that would create a conflict of interest and indicated that no former clients were on the State's witness list. Counsel further claimed that the State represented to him that it would not call any of Himel's former clients who were related to the victim to testify in this case. The circuit court concluded that a potential conflict existed and denied

---

[1]In its brief, the State refers to defendant's location of arrest as St. Louis. However, the record reveals that defendant was arrest in East St. Louis, St. Clair County, Illinois.

defendant's motion for leave to file an appearance. The trial commenced with attorney Johnson as defendant's sole representation.

Martina Brewer was called by the State and testified that she was Aramein's girlfriend at the time of his murder. On January 6, 2003, she and Aramein drove in a rented minivan to the gas station at 79th and Yates where Aramein met David Jennings, to purchase marijuana. She testified that when Aramein left the van, he removed a pistol from his waistband and left it in the van's glove compartment. Aramein approached another van, in which Jennings and Asim Akbar were sitting, while Brewer waited in the car. Brewer grew impatient with Aramein, who indicated to her that he was on his way back to their van when she heard gunshots. Brewer looked in the direction of the sound and observed a man running south on Yates while Jennings and Akbar fled the scene in their van. She immediately ran to where Aramein was lying and found him unresponsive. She returned to the car and retrieved the pistol left there by Aramein and ran in the direction of the shooter. She testified that the shooter disappeared and she did not see his face.

Shortly after the shooter fled, Jennings returned to check on Brewer. Someone asked her for Aramein's gun and she gave it to him. Aramein's brother, Ajani Brown, arrived at the scene around that time. He questioned Brewer regarding the shooting. Brewer testified that when she told Ajani that she did not see the shooter, he instructed her to tell police that defendant was the shooter. Brewer was unaware of Ajani's reason for asking her to identify defendant, but she stated that she was traumatized by witnessing her boyfriend's murder and was susceptible to Ajani's suggestion. She further testified that Ajani told her that if she did not cooperate with him, he would "cause trouble" for her and her family.

After she received Ajani's instructions, police arrived on the scene and took Brewer to the hospital where Aramein was pronounced dead. Brewer testified that when questioned later at police headquarters, she told investigators that defendant was the shooter and identified him in a photo array. She also testified before the grand jury that defendant was the shooter.

Brewer recanted her statement to investigators and her grand jury testimony at trial, explaining that the victim's brother, Ajani, told her to implicate defendant. Brewer explained that she was now being truthful because she did not want the conviction of an innocent man to be on her conscience. The circuit court advised Brewer that lying to the grand jury was considered perjury and appointed the public defender to consult with her before any further testimony was elicited. Following a consultation with an assistant public defender, Brewer

was reluctant to answer questions initially; however, she testified that she did not know who shot and killed Aramein.

Relative to her conflicting testimony before the grand jury and her statements to police identifying defendant as the shooter, Brewer explained that she was fearful of Ajani and thus followed his instructions. Brewer testified that the statement she gave to investigators was false, as was her testimony before the grand jury. Brewer said she was afraid of Ajani because he knew where she and her baby lived as well as where her mother and grandmother lived. She stated that Ajani threatened that he would harm her baby if she did not tell the police that defendant shot Aramein. Brewer testified that she felt she had no choice but to accuse defendant of the shooting.

After she recanted her prior testimony, the State questioned Brewer with regard to her original version of the January 6 occurrence. Brewer testified that she previously told the grand jury that someone came up from behind the van she was sitting in and shot Aramein several times. She also told investigators and the grand jury that she saw the shooter and he went by the name of "Yatta." Brewer accompanied police officers to police headquarters from the hospital on the day of the shooting. She selected defendant's picture from a photo array and signed her name and dated the photo. At trial, Brewer did not recall either being shown pictures while before the grand jury or identifying defendant. However, a grand jury transcript, which was not included in this record on appeal, was read to her and suggested that she was in fact shown photographs before the grand jury and identified defendant.[2] Brewer also testified that, following the shooting, an unidentified male approached her at her father's house and told her that defendant could not have been the shooter because he had a "bum leg." Brewer stated that she moved to New Orleans to avoid any involvement in the case, but returned to Chicago to "tell the truth of what really happened."

Homicide and Sex Division Assistant State's Attorney Nick Pappas was called as a witness on behalf of the State. Pappas testified that he was assigned to the grand jury unit of his division on February 27, 2003, the day Brewer testified before the grand jury. Brewer did not indicate in any way that she had been threatened to identify defendant as Aramein's shooter. Brewer told Pappas that Aramein was shot

---

[2]In its brief on appeal, the State alleges that "Brewer admitted that she had been shown the photograph at the grand jury and that she identified defendant as the shooter. At trial, Brewer denied that she had been shown any pictures." Brewer did not deny viewing photographs; rather, she testified at trial that she could not recall viewing photographs before the grand jury.

several times from behind while he was running away from his attacker. She told Pappas that the man who shot Aramein went by the name "Yatta." Once Aramein fell to the ground, the shooter began to run away and she followed him. Pappas stated that when shown a picture of defendant, Brewer identified him as the person who shot and killed Aramein.

After a short cross-examination of Pappas's procedures in presenting witnesses before the grand jury, the State called Sherry Collier to testify on the State's behalf. Collier and her five-year-old grandson were present at the gas station on 79th and Yates at approximately 10:30 p.m. on the evening of January 6. Collier stated that she was using the public telephone at the gas station when she noticed a van parked at the pump and a man standing next to the van. She also observed a girl enter the gas station store and came back out to another vehicle. A man who was wearing a matching black outfit approached the van and proceeded toward the victim on 79th Street. He walked within five feet of her, pulled his hood back and opened fire on the people standing near a parked van at the gas pump. The shooter pursued Aramein and continued to shoot until Aramein fell to ground. The shooter ran full speed southbound on Yates. Collier and her grandson ran across the street to a store and waited for police to arrive.

Moments after police arrived, Collier returned to the scene and gave a statement describing the offender as having dreadlocks and wearing a black outfit, including a matching skullcap and a hooded sweatshirt that covered his head until he began shooting. Collier subsequently identified defendant as the shooter in a photo array at her home shortly after the shooting, on February 26, 2003, in a lineup at Area 2 police headquarters and in open court at trial.

The State called Shawn Davis to testify on its behalf. Davis testified that he, his sister Samantha and his mother were home at 7938 South Yates Avenue in Chicago, just south of the gas station in question here. Davis testified that he heard gunshots as he was leaving his house between 10 p.m. and 10:30 p.m. on January 6, 2003, and immediately went back inside and looked out the front window. From the window, which faces South Yates Avenue, Davis saw a black man running from the direction of the gas station wearing a black, hooded sweatshirt and a black skullcap. The man had braided hair sticking out from under his hood and a beard. He ran at a "jogging sprint" to a red, two-door Dodge Stratus and sped off. According to Davis, the individual was approximately 5 feet 8 inches tall with a medium build. Davis did not tell the investigators at the scene that the shooter's face was unusual and did not identify defendant by name or indicate that

he knew defendant until he testified at trial. He testified that the individual had no difficulty running. On January 29, 2003, Davis identified defendant from a photo array shown to him by police in his house. The State rested its case-in-chief.

After defendant's motion for a directed verdict was denied, he called Keith Slaughter to testify on his behalf. Slaughter was a deacon at the New Promised Land Church on 79th Street. He testified that he and Reverend Brian Williams left the church around 10 p.m. on January 6, 2003, following a church business meeting. While waiting at a red light to turn south at the intersection of 79th and Yates, Slaughter heard gunshots coming from the gas station. He looked in that direction and observed one man fall to the ground and another man run south on Yates. The shooter ran toward a red Ford Taurus station wagon and drove off. Slaughter and Williams began to chase after the red station wagon to obtain the license plate number, but they could not get close enough to read the plate. Slaughter and Williams returned to the gas station, but neither spoke to police before leaving the scene.

Aramein's father called Slaughter several weeks after the shooting and asked if he would be willing to speak to police officers about the shooting. Slaughter agreed and spoke to police at his home on February 19, 2003, where he told them what he observed and indicated that he could not identify the shooter. Slaughter testified that the detective showed him a photo array and he pointed to a photo that he thought resembled the shooter but indicated that he was not sure. Slaughter stated that the detective told him that he had identified the shooter. One week later, Slaughter viewed a lineup at police headquarters. He told the police officer that one of the people in the lineup was the person that he saw in the photo array. Slaughter testified that he never told the detective that the man in the lineup was the man he saw on January 6, 2003. He further indicated that he could not make an in-court identification of defendant as the man he saw on January 6.

Asim Akbar was a friend of David Jennings and was present with him on the night Aramein was shot. Akbar testified that he sold marijuana to Aramein at the gas station immediately preceding the shooting. Akbar described the shooter as approximately 6 feet tall with a slim build, a beige outfit with a tannish-brown skullcap and a silver gun. The shooter had a beard and no hair was sticking out of his skullcap. As soon as the shots were fired, Jennings and Akbar drove away, but Jennings wanted to return to the gas station. Akbar refused,

turned the van over to Jennings and left on foot. Akbar testified that he saw the shooter and defendant was not the shooter.[3]

Defendant called Detective John Fassel, who testified about the identification of the shooter in photo arrays and in the lineup conducted at the police station. Detective Fassel testified that he interviewed Slaughter on February 19, 2003, and showed him a photo array from which Slaughter positively identified defendant as the shooter. When asked whether Slaughter equivocated on the identification, Detective Fassel testified that he did not and denied that Slaughter stated that the person in the photo only looked like the shooter. Detective Fassel brought Slaughter to an in-person lineup at area headquarters on February 26, 2003. Fassel testified that Slaughter again positively identified defendant as the shooter and was neither hesitant nor uncertain. Detective Fassel testified that Collier positively identified defendant as the shooter from both the photo array and the lineup without hesitation. Finally, Detective Fassel testified that defense counsel was present at the lineup but prohibited from viewing the witnesses as they identified the shooter. He stated that attorneys were not allowed in the separate viewing room with the witnesses to ensure that the witnesses were not intimidated, pursuant to Chicago police department operating procedures. Detective Fassel testified that defense counsel is allowed to be with his client, but not the witnesses as a matter of police policy.

Brian Williams testified for the defense. He stated that he was the pastor of the Holy Fellowship Church and was leaving a board meeting with Slaughter on the night of January 6, 2003, at approximately 10 p.m. Williams stated that he heard gunshots while the two were waiting to turn south onto Yates at the intersection of 79th and Yates and saw a man running from the gas station. He described the man as between 5 feet 9 inches and 5 feet 11 inches with a medium build, wearing a tan jacket, matching pants and hat. The man was not wearing a hooded sweatshirt and had no dreadlocks. Williams testified that he saw the collar line of the man's jacket and his face. The man ran at full speed from the gas station to a car on Yates and had no unusual facial characteristics. Williams testified that the shooter was not defendant.

---

[3]In its brief, the State represents that Akbar made an in-court identification of defendant as the shooter. It also represents that Akbar testified that he was neither threatened nor pressured to identify defendant as the shooter. The record, however, belies these claims and the State conceded its mistake at oral arguments.

Samantha Davis, Shawn Davis's sister, was present with Shawn in their home at the time shots were fired at the gas station. She testified that she ran to the window with Shawn and saw a man running from the gas station to a green Dodge Stratus or Chrysler Sebring. The man was wearing a black skullcap, black, hooded sweatshirt, black jacket, black pants and black shoes. The man did not have braids, long hair or any unusual facial features; he was tall and slim and had a round face. Samantha told police what she had seen and gave a description of the man she saw running, but she could not identify the shooter from any photos. Samantha testified that defendant was not the man running from the direction of the gas station on January 6, 2003.

Annie Handy testified as an alibi witness on defendant's behalf. Handy stated that defendant, her two daughters, Tonya and Anastasia, and her grandson were present at her house on January 6, 2003, from approximately 8 p.m. until 11:15 p.m. Handy recalled having dinner, which Tonya picked up from a nearby restaurant, with defendant, Anastasia, Tonya and her grandson. They all watched television, and following the evening news, Handy retired for the night at 10:30 p.m. and Anastasia left. Handy woke from her sleep at approximately 11:15 p.m. and found defendant and Tonya playing cards. Handy told defendant that it was time for bed and that he had to leave.

Tonya Evans testified for the defense. She testified consistently with Handy regarding the timing and sequence of events. Evans testified that her mother went to sleep around 10:30 p.m. following the evening news and that she and defendant began to play pitty-pat for money. They were trying to play quietly because her mother did not allow gambling in the house. Approximately 45 minutes later, Handy awoke from her sleep and told defendant that it was time for him to leave.

Defendant testified on his own behalf and denied that he had anything to do with the shooting death of Aramein. Defendant testified that he suffered from acromegaly, a debilitating growth hormone imbalance due to a tumor placing pressure on his pituitary gland. The disorder, which was diagnosed in 1996, causes his bones to protrude at the joints. He also testified that he suffers from severe arthritis. As a result of these diseases, his face is disfigured and he has been incapable of running or jumping for at least 12 years preceding his trial. He also testified that, from time to time, he is required to use a cane to walk although he was not using a cane at the time of the trial.

He further testified that he knew the Brown brothers and had been friends with the family until the end of 2002, when they had a falling out. He was not present at 79th and Yates on the night of

Aramein's shooting, but was with Evans at her mother's home on 63rd and Laflin Streets in Chicago. He testified that they ate and watched television until the 10 o'clock news ended. Handy went to bed and he and Tonya played cards until approximately 11 p.m. He left in a gray car and drove to his home in Park Forest, Illinois. Defendant pulled his pant legs up to show the court the deformity in his knees. He stated he was 5 feet 8½ inches tall and weighed 175 pounds.

Following the evidence and arguments, the circuit court took the case under advisement and subsequently returned a verdict of guilty on first degree murder. In delivering its ruling the court stated:

> "It goes without saying that witnesses are reluctant to come into a court of law in any case, especially a charge of first degree murder. The court has examined the possibilities for the reluctance of some of the witnesses and the testimony of the witnesses and any possible motives, bias or interests they may have. The court finds on the credibility of the witnesses who I have observed, their demeanor, their manner while testifying and the reasonableness of all of them that the defendant has been proven guilty beyond a reasonable doubt of the charge of first degree murder."

Defendant was sentenced to 55 years' imprisonment. Defendant filed this timely appeal; however, he failed to properly preserve the violations of his sixth amendment rights in his posttrial motion, which he now raises on appeal.

## ANALYSIS

### I. Procedural Default

Defendant contends that he was denied his sixth amendment right to counsel on two separate occasions. First, during the in-person lineup at area police headquarters when defense counsel was barred from viewing the witnesses identify defendant. As a result he was deprived of any meaningful cross-examination of the witnesses' certainty in identifying defendant and of any challenge to the practices or suggestiveness of the procedures that occurred in the privacy of the witness room. Second, defendant claims that he was denied his choice of co-counsel when the circuit court denied attorney Himel's motion for leave to file an appearance without a specific finding that co-counsel labored under a *bona fide* conflict of interest.

The State responds by advancing the threshold argument that defendant has procedurally defaulted his claims that the circuit court abused its discretion in denying co-counsel's request for leave to file an appearance and that his sixth amendment rights were violated when counsel was barred from viewing the witnesses identify defendant because neither claim was preserved in a posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988).

Generally, the failure to set forth the alleged errors made by the trial court and to specify grounds for a new trial in a posttrial motion constitutes a procedural default of the issue on review in the absence of plain error. *People v. Naylor*, 229 Ill. 2d 584, 592-93 (2008). Defendant admits that this specific claim was not properly preserved by trial counsel for purposes of this appeal, and he urges this court to excuse his procedural default and consider his allegations of error under the plain-error doctrine of Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)).

The plain-error doctrine is a limited and narrow exception to the general rule of procedural default which allows a reviewing court to consider unpreserved error when one of two conditions is met: "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007); *Naylor*, 229 Ill. 2d at 593.

Under both prongs of the plain-error doctrine, the burden of persuasion remains with defendant. *Naylor*, 229 Ill. 2d at 593. If a defendant fails to satisfy this burden, the result is that the "procedural default must be honored." *People v. Keene*, 169 Ill. 2d 1, 17 (1995). However, after reviewing the record, we find that the evidence in this case was closely balanced. In the record, seven witnesses were called to testify. Two witnesses identified defendant as the shooter, three testified he was not the shooter and two could not identify defendant as the shooter. There was no physical evidence, only eyewitness testimony. Among the seven witnesses, the descriptions of the offender varied greatly. Akbar, Williams and Slaughter saw a man wearing a tan jacket with matching pants, boots and skullcap with no dreadlocks. Sherry Collier saw a man in a black leather jacket with a black, hooded sweatshirt, black skullcap, long dreadlocks and a beard. Williams and Slaughter testified that the shooter ran to a red Ford Taurus station wagon and fled. Samantha Davis testified that he ran to a green Chrysler Sebring. Shawn Davis testified it was a four-door red Dodge Stratus. The height and weight description ranged from 5 feet 8 inches to 6 feet 2 inches and the build slim or medium. All witnesses testified that the shooter had no difficulty running and ran at or nearly at full speed after the shooting, even though defendant allegedly suffered from a debilitating bone disease which he claims has prevented him from running for many years prior to 2003. Despite the State's assertion to the contrary, the alibi testimonies of Handy and

Evans were consistent and did not vary from defendant's version of the January 6, 2003, events. We find the evidence in this case to be very closely balanced.

■ We reiterate that our analysis here is merely a determination of whether the evidence was closely balanced. We are not reweighing the evidence before us or evaluating the sufficiency thereof because defendant does not challenge it on appeal. We further find, despite the thinness of the evidence, that Collier's and Shawn Davis's eyewitness testimony was sufficient to sustain defendant's conviction. Collier gave compelling testimony at trial regarding defendant's appearance which, although contradicted by other eyewitness accounts, was corroborated by Shawn Davis. Collier also identified defendant as the shooter from a photo array, the lineup in question and in court.[4] We conclude that the evidence was closely balanced and find no basis to support the State's contention that it was overwhelming. As a result, we will address defendant's claim that his sixth amendment right to assistance of counsel was violated.

## II. Right to Counsel at Lineup

First, we address defendant's claim that he was denied assistance of counsel because his attorney was excluded from the witness room during an in-person lineup. Defendant alleges that although counsel was present, his assistance was not meaningful because he insisted but was not allowed to view or hear the witnesses identify defendant at the lineup. Instead, counsel was required to stand outside the witness room, next to his client, where he could neither hear nor view the moment of identification. The State concedes, and it is well-established law in Illinois, that a lineup conducted after adversarial judicial criminal proceedings have commenced is a "critical stage" and denying counsel during a lineup impermissibly violates an accused's sixth amendment right to counsel. *People v. Curtis*, 113 Ill. 2d 136, 143 (1986). Once attachment of the sixth amendment right to counsel occurs, the accused is entitled to the presence of appointed counsel during any "critical stage" of the postattachment proceedings. *United States v. Wade*, 388 U.S. 218, 226-27, 18 L. Ed. 2d 1149, 1157, 87 S. Ct.

---

[4]The State argues that Collier and Slaughter did not know defendant prior to trial and independently identified him as the shooter in court. Slaughter did not identify defendant in court and testified that he did not identify defendant as the shooter in any other pretrial proceeding. Shawn Davis, however, identified defendant as the shooter in court, but he did not attend an in-person lineup. Davis disclosed for the first time at trial that he knew defendant from the neighborhood and had seen him at a party 10 to 15 years prior to January 6, 2003.

1926, 1932 (1967). If a lineup is held in violation of the sixth amendment, any evidence offered by the State showing that witness identified the accused from that process is subject to a *per se* rule of exclusion. *Gilbert v. California*, 388 U.S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951 (1967); *Curtis*, 113 Ill. 2d at 143.

Defendant's claim here is that barring defense counsel from viewing the witnesses while identifying defendant deprived him of any meaningful cross-examination of the lineup identification. Specifically, Detective Fassel was able to bolster Sherry Collier's in-court identification by testifying that Collier unequivocally identified defendant at the lineup. In addition, defendant complains of the State's advantage in presenting testimony supporting the propriety of identification events and the procedures implemented in the portion of the lineup from which defense counsel was excluded. In particular, defendant points out that he could not effectively cross-examine Detective Fassel and Collier because he was not present and that Detective Fassel's testimony regarding Keith Slaughter's identification was irreconcilable with Slaughter's account of the events that occurred in the witness viewing area. Finally, defendant points out that the circuit court specifically recognized that testimony was conflicting but chose to believe the State's witnesses.

Defendant cites to *Wade* and *Gilbert* to support his contention that barring defense counsel from the witness room was a violation of his sixth amendment rights. The State acknowledges that the *Gilbert* and *Wade* Courts detailed the critical nature of the identification process and prejudice that occurs when an accused is denied counsel in a lineup after attachment. However, the State argues that *Wade* is not on point because the defendant's counsel in that case was not notified and did not appear at the lineup. See *Wade*, 388 U.S. 218, 18 L. Ed 2d 1149, 87 S. Ct. 1926. In this case, counsel was allowed to be with his client at the lineup but not permitted to view the witnesses to prevent witness intimidation and to protect their identities. The State urges this court to find that defendant is only entitled to the presence of his counsel, which does not include counsel's right to see or hear witnesses identify the accused. Furthermore, the State asserts that defense counsel may sufficiently protect the sixth amendment rights of the accused after the fact, by cross-examining the detectives and/or the State's Attorneys who are allowed to be present when the witnesses make the identification. Finally, the State contends that the police policy prohibiting defense counsel from the witness room protects counsel from being called as a witness in the case, which will disqualify that attorney from representing the accused. *United States v. Johnston*, 690 F.2d 638 (1982).

As the State correctly notes, the issue before us is one of first impression in Illinois. The issue is whether defendant's sixth amendment right to have counsel present during the lineup includes the right to have him present at the moment of identification. Although neither this court nor our supreme court has ruled on the issue, our research has revealed that the issue has been addressed by our sister jurisdictions and by the federal circuits with mixed outcomes. We conclude, based on the facts of this case and what we consider to be the best-reasoned logic of other jurisdictions, that defendant was entitled to have counsel present at the moment of identification and that its denial during a postattachment lineup requires reversal absent a showing of harmless error. *Wade* 388 U.S. at 242, 18 L. Ed. 2d at 1166, 87 S. Ct. at 1940; *Gilbert* 388 U.S. at 272, 18 L. Ed. 2d at 1186, 87 S. Ct. at 1956; *People v. Brooks*, 187 Ill. 2d 91, 129-30 (1999); *People v. Simpson*, 172 Ill. 2d 117, 141 (1996); *Curtis*, 113 Ill. 2d at 143.

In *Wade* and *Gilbert*, the United States Supreme Court held that a pretrial lineup was a "critical stage" of the prosecution at which the accused was entitled to the presence of counsel. *Wade* 388 U.S. at 242, 18 L. Ed. 2d at 1166, 87 S. Ct. at 1940; *Gilbert* 388 U.S. at 272, 18 L. Ed. 2d at 1186, 87 S. Ct. at 1956. The Court held that if a witness identified a defendant in a lineup conducted in violation of the defendant's right to counsel, subsequent in-court identifications by that witness were inadmissible unless shown by clear and convincing evidence to have an origin independent of the illegal lineup. The Supreme Court has also held that if in-court identifications without independent origin were admitted into evidence, the error required reversal unless it was harmless beyond a reasonable doubt. *Wade*, 388 U.S. at 242, 18 L. Ed. 2d at 1166, 87 S. Ct. at 1940; *Gilbert* 388 U.S. at 272, 18 L. Ed. 2d at 1186, 87 S. Ct. at 1956; *Brooks*, 187 Ill. 2d at 129-30; see also *Simpson*, 172 Ill. 2d at 141.

These rules were adopted to enable an accused to detect any unfairness in his confrontation with the witness and to insure that he will be aware of any suggestion by law enforcement officers, intentional or unintentional, at the time the witness makes his identification. See *People v. Williams*, 3 Cal. 3d 853, 856, 478 P. 2d 942, 944, 92 Cal. Rptr. 6, 8 (1971), quoting *Wade*, 388 U.S. at 230-32, 18 L. Ed. 2d at 1159-60, 87 S. Ct. at 1934-35. We do not agree with the State that defendant is capable of intelligent and meaningful cross-examination of witnesses if defense counsel is excluded from viewing the moment of identification, much less when he is relegated to standing by his client for little more than moral support. *Williams*, 3 Cal. 3d at 856, 478 P. 2d at 944, 92 Cal. Rptr. at 8.

In *People v. Williams*, the California Supreme Court held that a defendant's right to have counsel present during a lineup included the right to have him present when identification was made by a witness. *Williams*, 3 Cal. 3d at 857, 478 P. 2d at 945, 92 Cal. Rptr. at 9. In *Williams*, defense counsel was notified and appeared on behalf of the defendant at the lineup. Counsel was allowed to be present in the viewing room with the witness up until the time the witness identified the defendant. After the witness had viewed the individuals in the lineup from the viewing room, officers removed him to a private area where defense counsel was not allowed to enter. Counsel asked to be present when the witness made the identification, but his request was rejected pursuant to police policy. *Williams*, 3 Cal. 3d at 855, 478 P. 2d at 943, 92 Cal. Rptr. at 7. At trial, the witness testified that he was almost certain that the defendant was one of the offenders but he could not be sure. Defendant moved to suppress the identification evidence based on a violation of his sixth amendment right to presence of counsel at the pretrial lineup. The California trial court denied his motion, holding that the defendant's right to counsel did not extend beyond the time the lineup was in progress. *Williams*, 3 Cal. 3d at 856, 478 P. 2d at 944, 92 Cal. Rptr. at 8.

In reversing the trial court's ruling, the *Williams* court stated:

> "It is not the moment of viewing alone, but rather the whole 'procedure by which [a suspect] is identified' that counsel must be able to effectively reconstruct at trial. [Citation.] If defense counsel is to be able to intelligently cross-examine the witness, he cannot be excluded from the moment of identification any more than he can be excluded from the lineup itself. To hold otherwise would be to reduce counsel's cross-examination 'to little more than shooting in the dark,' for he would not be fully apprised of what occurred at the identification interview. [Citation.] For example, the defendant would have no way of knowing whether the witness was improperly led, whether the witness was hesitant or unsure in his identification, and he would not know what language or expressions the witness used. All of these factors could be very significant on cross-examination." *Williams*, 3 Cal. 3d at 856, 478 P. 2d at 944, 92 Cal. Rptr. at 8.

We agree with the California high court that a general police policy of prohibiting counsel from observing the moment of identification frustrates the second purpose of *Wade* and *Gilbert*, which is to safeguard against the inherent risks of suggestion (intentional or unintentional) that are present in lineups generally. This is especially true in this case, where defense counsel was in all respects prohibited from any contact with the witnesses or those conducting the lineup.

In *State v. McGhee*, 350 So. 2d 370 (La. 1977), the Louisiana Supreme Court held that a procedure implemented by police wherein defense counsel was permitted to observe and be present for every aspect of the lineup except the moment when the witness made the actual identification was a violation of defendant's sixth amendment right to assistance of counsel and inconsistent with the spirit of *Wade*. *McGhee*, 350 So. 2d at 371-73. The Louisiana high court reasoned:

> "[T]he lineup as a stage of the proceedings against a charged defendant is made up of several interdependent parts: the suspect parade or assembly, the witness' viewing, the witness' reaction to the viewing, and the witness' verbal or written assertion of that reaction. The confrontation which *Wade* concluded was a critical stage of the prosecution can hardly be said to have terminated with the witness' viewing. The witness' reaction is surely a part of the viewing, and its communication is surely a part of the lineup. Furthermore, confrontation in the context of a 'stage' of prosecution should rationally include not only a defendant's being placed for view before a witness for that witness' reaction (identification) but also, by virtue of his counsel's presence, the defendant's being entitled to have viewed the witness' condemnatory verbal or written identification. Surely this must be so if, as *Wade* says, counsel's presence at the lineup is necessary to facilitate meaningful cross-examination at a suppression hearing and/or at trial, and possibly to prevent, by his simple presence, otherwise improper influence or suggestion." *McGhee*, 350 So. 2d at 373.

Similarly, the Supreme Court of New York County in *People v. Johnson*, 99 Misc. 2d 450, 455, 416 N.Y.S.2d 495, 499 (1979), held that where defense counsel could not see the moment of confrontation because he was shielded from the witnesses by a sheet and could not hear discussions during the lineup, defendant was deprived of effective assistance of counsel. *Johnson*, 99 Misc. 2d. at 454, 416 N.Y.S.2d at 498. As a result of the procedures employed by the police to shield the witnesses from defense counsel, defense counsel's recollection of the lineup was hopelessly confused because he could neither see nor hear the moment of identification. The New York trial court reiterated:

> "The right to counsel means, of course, the right to effective assistance of counsel. The dangers inherent in identification proceedings are too numerous and well-known to be reviewed generally here. [Citation.] Indeed, one of the very dangers of lineups conducted in the absence of counsel is that a suspect, even unwittingly, may be pointed out before or during a lineup. [Citation.] Further, the Supreme Court in *Wade* succinctly stated the preventive and corrective roles of defense attorneys at the identification proceeding." *Johnson*, 99 Misc. 2d. at 458, 416 N.Y.S.2d at 501.

The role of the defense attorney, to which the *Johnson* court refers, serves to prevent or mitigate conditions that defendants are not "apt to be alert for," "[a]nd if they were, it would likely be of scant benefit to the suspect since neither witnesses nor lineup participants are likely to be schooled in the detection of suggestive influences." *Wade,* 388 U.S. at 230, 18 L. Ed. 2d at 1159, 87 S. Ct. at 1934. Simply put, assuming first that a defendant is able to see and hear and second that he is capable of detecting suggestive practices, whether intentional or not, he is left to his own devices in recalling and recreating the conditions of the identification and then to compete in a credibility contest that includes him, a witness or victim and a law enforcement agent or State's Attorney. Such a position, in our view, creates Olympian barriers to meaningful reconstruction of the lineup and attack the propriety of a courtroom identification if conditions existed that called into question the pretrial lineup.

The *Johnson* court additionally held it was "apparent that the measures taken by the police in this lineup, however well-meaning, deprived [the defendant] of the effective assistance of counsel" because he could not see or hear the moment of confrontation. *Johnson,* 99 Misc. 2d at 459, 416 N.Y.S.2d at 501. The prosecutors in *Johnson,* as is the case here, argued that the State "ha[s] a right to protect the identity and safety of their witnesses and that the measures that the police employed at the lineup were consonant with this right and were not of such a scale as to deny [the defendant] of his right to counsel." *Johnson,* 99 Misc. 2d. at 459, 416 N.Y.S.2d at 501. The court disagreed, finding that during the preliminary stages of criminal proceedings the State may wish to conceal the identity of some of their witnesses; however, "the defendant's right to counsel coexists with the right to protect witnesses and it cannot and need not be extinguished by it." *Johnson,* 99 Misc. 2d at 459, 416 N.Y.S.2d at 501-02. We, like the New York court, find it significant that the United States Supreme Court considered this very problem as far back as *Wade,* where it noted:

> "Concern is also expressed that the presence of counsel will force divulgence of the identity of government witnesses whose identity the Government may want to conceal. To the extent that this is a valid or significant state interest there are police practices commonly used to effect concealment, for example, masking the face." *Wade,* 388 U.S. at 238 n.28, 18 L. Ed. 2d at 1164 n.28, 87 S. Ct. at 1938 n.28.

> "In our view counsel can hardly impede legitimate law enforcement; on the contrary, for the reasons expressed, law enforcement may be assisted by preventing the infiltration of taint in the prosecution's identification evidence. That result cannot help the

guilty avoid conviction but can only help assure that the right man has been brought to justice." *Wade*, 388 U.S. at 238, 18 L. Ed. 2d at 1163-64, 87 S. Ct. at 1938.

We also find it important to recognize the authority holding the opposite: that defense counsel is not entitled to view the witnesses at the moment of identification. In *United States v. Banks*, 485 F.2d 545, 548 (5th Cir. 1973), the Fifth Circuit Court of Appeals held that it was not a violation of the defendant's sixth amendment rights when counsel was not allowed to see or hear the initial response of the witness. The government agents in that case held private conferences with each witness, individually after they had viewed the lineup in which the two defendants were present. The agents explained that it was necessary to speak privately and individually to each witness to prevent one witness's response from influencing others. The *Banks* court found that defense counsel was not prohibited from conducting his own conference with the witnesses thereafter and was further able to cross-examine the witnesses at trial regarding the private conference from which counsel was barred. *Banks*, 485 F.2d at 548.

The Fifth Circuit Court in *Banks* declined to establish a *per se* rule as to whether an accused is entitled to have counsel present at interviews between government agents and witnesses relative to lineups. However, the court clearly indicated that its ruling was narrow and limited to the facts of the case before it. *Banks*, 485 F.2d at 548. The *Banks* court emphasized that similar procedures might require reversal if counsel was denied the opportunity to reconstruct all of the elements of the lineup and related agent-witness interviews, or if any witness indicated suggestive techniques by the prosecution agents while defense counsel was excluded. The *Banks* court went on to state that "[c]landestine conferences may not be used for the purpose of evading the clear constitutional mandate of *Wade* and *Gilbert*." *Banks*, 485 F.2d at 548-49.

*Banks* is distinguishable from the case before us because the defense attorney in that case was given the opportunity to conference with the witnesses in private following the government agent's private conference. The process employed in the instant case is more like the clandestine conference referenced in *Banks* where no one except the police, State's Attorneys and the witnesses know what occurs in the viewing room.

In *United States v. Wilcox*, like *Banks*, the court found in favor of the government's practice of privately interviewing witnesses outside the presence of defense counsel while allowing unlimited, private interviewing of the witness by the defense afterwards. *United States v. Wilcox*, 507 F.2d 364, 366-67 (4th Cir. 1974). However, *Wilcox* observed,

relative to *Wade* and the defendant's sixth amendment rights, that "[t]here is no dispute that the *Wade-Gilbert-Stovall* trilogy clearly mandates the presence of counsel at an identification lineup where there is a confrontation compelled by the State between the accused and the victim or witnesses to a crime." *Wilcox* 507 F.2d at 367. Focusing on the "trial-like confrontation[s]" described in *United States v. Ash*, 413 U.S. 300, 314, 37 L. Ed. 2d 619, 629, 93 S. Ct. 2568, 2576 (1973), the *Wilcox* court determined that "*Wade* and related cases [are] limited in application 'to the period during which an accused is within sight of a potential identification witness,' or, as *Ash* puts it, quoting from *Wade*, at the point where there is a 'pretrial confrontation, with the State aligned against the accused,' for the sixth amendment [as developed in *Wade*] applies only to personal confrontations between the accused and the state." *Wilcox*, 507 F.2d at 369.

While the facts and circumstances in *Wilcox* may not rise to the level of a sixth amendment violation where counsel was allowed to view the entire process except for a private conference between the witness and the State, followed by an opportunity for the same with defense counsel, we do not have those facts before us. The *Wilcox* case is factually distinguishable and is of little instructive value to the instant case because defense counsel was wholly excluded from any and all observation of the witnesses and the procedures or the events that occurred in the viewing room.

In *Doss v. United States*, 431 F.2d 601 (9th Cir. 1970), the defendants there conceded the lineups were not unfairly conducted and that their attorneys were in attendance but that their counsel was not permitted to listen to any remarks that may have passed between the witnesses and the officers, both during the lineup and immediately afterward. Relying on *Wade*, the defendant strenuously argued that the sixth amendment guarantee of counsel includes this latter right but the court disagreed. The *Doss* court held that although there is grave potential for great prejudice in the pretrial lineup that may not be capable of reconstruction and could result in a mistaken identification of a suspect in a lineup, defense counsel could be excluded from conferences between witnesses and government agents where an identification was made. The court did not believe that the ordinary witness was so unlikely to be schooled in the detection of influences of verbal suggestion that he could not recall them on cross-examination. *Doss*, 431 F.2d at 603-04. In other words, *Doss* does not mandate that counsel be allowed to sit in on conferences with prospective witnesses at any time because ordinary individuals are capable of recalling and recounting the conversations concerning the identity of a suspect and would likely testify to such at trial.

We disagree with this approach because it conflicts with *Wade* and its view on suggestive practices and the skill required to detect such subtle, but impermissible suggestion. See *Wade*, 388 U.S. at 230, 18 L. Ed. 2d at 1159, 87 S. Ct. at 1934 (where it stated, "[N]either witnesses nor lineup participants are apt to be alert for conditions prejudicial to the suspect. And if they were, it would likely be of scant benefit to the suspect since neither witnesses nor lineup participants are likely to be schooled in the detection of suggestive influences").

In this case, defense counsel was prohibited, by policy, from viewing, hearing, speaking to or knowing the identity of the witnesses. In fact, the defense under the *Doss* ruling and in this case is required to rely on police assurances that whatever occurred behind the closed doors of the viewing room was neither improper nor suggestive. We find it difficult to expect a defendant to accept the proposition that the same agencies that are investigating and prosecuting him will also be given the responsibility to assure that identification in a lineup was conducted appropriately without the benefits of any checks and balances. We do not dispute that an ordinary witness is capable of recalling, to a certain degree, what may have been said and how others may have reacted or gestured, but this ability significantly diminishes over time. Such is the case here, where the lineup occurred in February 2003, but the trial did not commence until 2006. This ruling further assumes that a witness can identify whether suggestive practices were employed and recall them at trial. However, a face-to-face encounter either between defendant and the witnesses or between defense counsel and the witnesses did not occur here such that defendant or counsel could later testify regarding the procedures employed by the police and the reactions of the witnesses.

In *United States v. Cunningham*, 423 F.2d 1269 (4th Cir. 1970), various witnesses were interrogated in the presence of defense counsel as to possible identification after the defendant was presented in the lineup. One of the witnesses identified a person not suspected of the crime. Counsel for the defendant insisted upon knowing the name of the person who was misidentified. The assistant United States Attorney supervising the lineup refused to give any information about the misidentification and an argument erupted. Defense counsel was ejected from the interrogation, and a second witness, who later identified the defendant at trial, picked him from the lineup in the absence of the defendant's counsel. The defendant in *Cunningham* argued that he was denied his right to counsel because the second witness was interviewed in the absence of counsel. The *Cunningham* court ruled:

> "While *Wade* and *Gilbert* both hold that under the sixth amendment an accused is entitled to the aid of counsel at the lineup, we

cannot read the scope of the holding to extend beyond the actual confrontation between the accused and the victim or witnesses to a crime from whom identification evidence is sought to be elicited. The rationale of these cases is the potential intentional or unintentional suggestion inherent in the actual confrontation and the difficulty of establishing at trial by objective evidence the circumstances under which the lineup proceeded. Here, the lineup was terminated and witnesses were being interrogated outside of the presence of suspects. Confrontation had occurred and was terminated. By the rationale of *Wade* and *Gilbert*, counsel was no longer required unless we were prepared to hold that defense counsel must be present whenever the government interrogates a witness whose testimony may be used as part of the government's case at trial." *Cunningham*, 423 F.2d at 1274.

While we agree with the *Cunningham* court that each and every postconfrontation interaction between the State and a witness is not subject to defendant's sixth amendment right to assistance of counsel, we view the actual identification of the accused by the witness as a necessary component to the post-attachment lineup to which defendant is entitled to the assistance of counsel. In our view, the moment of identification is as much a part of the confrontation as is the manner in which the lineup is conducted. In addition, the process by which defendant was identified by the witness in the instant case was conducted in total secrecy and controlled entirely by the police. *Cunningham* differs in that the process there was open to defense counsel until a heated exchange occurred between attorneys. However, we do not agree with *Cunningham* that the identification following defense counsel's expulsion is properly characterized as a "postconfrontation" conference and we interpret *Wade* to prohibit the introduction of in-court identification in this instance unless it were shown to have arisen from a source independent of the lineup.

Under the circumstances here, defense counsel would have no way of knowing whether the witness was improperly led or whether the witness was hesitant or unsure in his identification, and he would not know what language or expressions the witness, police or State's Attorneys used in the identification process. These facts could have been of great significance in cross-examining Detective Fassel and perhaps Collier. However, counsel's presence at the lineup only afforded the opportunity to detect impropriety in the confrontation between defendant and the witness to the extent that it occurred in counsel's presence while he was standing next to defendant outside of the viewing room. By barring defense counsel from viewing the witnesses at the moment of identification, the second purpose of *Wade*, which is to

safeguard against the inherent risks of suggestion that are common in a lineup, was defeated. *Williams*, 3 Cal. 3d at 856, 478 P.2d at 944, 92 Cal. Rptr. at 8.

■ We cannot ignore what appears to be the result of defense counsel's absence from the viewing room, and that is the irreconcilable difference between Detective Fassel's and Deacon Slaughter's testimony of what occurred in the viewing room. We do not suggest that the State's attempt to avoid witness intimidation or to preserve the identities of witnesses is based on any nefarious purpose. Nevertheless, it would not have been unduly burdensome on the police to employ the less restrictive methods of protecting witnesses such as masking them while conducting the lineup, which would have satisfied defendant's sixth amendment rights according to *Wade*. *Wade*, 388 U.S. at 238, 18 L. Ed. 2d at 1163-64, 87 S. Ct. at 1938. Additionally, we are mindful that the function of an advocate is to advance the cause of his client and that of a witness is to objectively state facts and that the one is inconsistent with the other. *United States v. Johnston*, 690 F.2d 638, 642 (7th Cir. 1982). This, however, is not a consideration that should eviscerate an accused's right to effective assistance of counsel when the common and recognized practice for an attorney who will be called as a witness is to withdraw from further representation of that client. *Johnston*, 690 F.2d at 642. Moreover, we can perceive no legitimate state purpose in wholly excluding defense counsel from the entire process of presentation of the accused to the witnesses and the subsequent identification. See *People v. Fowler*, 1 Cal. 3d 335, 344, 461 P.2d 643, 650, 82 Cal. Rptr. 363, 370 (1969) (stating "[w]e cannot reasonably suppose that the high court *** would announce *** a rule so susceptible of emasculation by avoidance"). We therefore hold that a total prohibition of defense counsel from observing the moment of identification is a violation of *Wade*, *Gilbert* and the accused's sixth amendment right to effective assistance of counsel.

## III. Attachment of Sixth Amendment Rights

Although we find that the policy of excluding defense counsel from the witness room at the moment of identification is contrary to *Wade* and violates an accused's sixth amendment right to counsel, the State correctly notes that a defendant's right to counsel must attach before a violation of defendant's sixth amendment right during a lineup will require suppression of witness testimony at trial. Defendant argues that his right to counsel attached when (1) the police obtained approval for felony charges against defendant; (2) he appeared before a judge who found probable cause to issue a warrant based on the evidence furnished to him by the police and set bail at $1 million; (3) the United States Marshall's police arrested him on February 20,

2003, in East St. Louis, Illinois, and transported him to Cook County, Illinois; and (4) he was jailed for eight days without being brought before a judge pursuant to section 109—1 of the Code of Criminal Procedure of 1963 (the Code) (725 ILCS 5/109—1 (West 2002)). In other words, he argues that prosecution commenced before the lineup occurred and the fact that he was not brought before a judge does not prevent attachment because the State forestalled him from being brought before a judicial official.

In response, the State relies upon the authority requiring defendant to show that the prosecution has focused its efforts on the accused before his sixth amendment right to counsel attaches. The State contends that attachment had not occurred at the time of the lineup because there was no significant prosecutorial involvement. The State further argues that the police, not the State's Attorney, organized the lineup, defendant had not been brought before a judicial officer and the criminal complaint was not filed until two days after the lineup on February 28, 2003. In its response, the State claims that the delay in bringing defendant before a judge prior to the lineup had been known to defendant and was not raised prior to appeal and should, therefore, be waived. The State further alleges that defendant failed to provide any evidence in the record that he had not waived his right to be taken before a judge in St. Clair County, thus relieving the State of any obligation to explain why defendant was not brought before a judge until his eighth day in custody and after his lineup.

Defendant responds to the State's "prosecutorial awareness" argument relying principally upon the recent United States Supreme Court decision in *Rothgery v. Gillespie County, Texas*, 554 U.S. 191, 171 L. Ed. 2d 366, 128 S. Ct. 2578 (2008), where the Supreme Court rejected the "prosecutorial awareness test" in commencing criminal prosecutions for attachment of sixth amendment rights. See *People v. Young*, 153 Ill. 2d 383, 404 (1992); *People v. Hayes*, 139 Ill. 2d 89, 125 (1990); *People v. Owens*, 102 Ill. 2d 88, 101 (1984) (all of which held that the circuit court is to consider the degree to which prosecutors, rather than the police, have focused on the accused when determining whether an accused's sixth amendment right has attached).[5] We agree

---

[5]Defendant sought leave to supplement authority with the *Rothgery* case after we took this case under consideration and moved this court to summarily reverse and remand this matter for a new trial. We granted defendant's motion for leave to supplement and denied his motion for a summary reversal. The State did not address defendant's claim that he was illegally detained prior to the lineup or the defendant's citation to *Rothgery* as supplemental authority until this court, *sua sponte*, ordered the State to respond.

with defendant that prosecutorial involvement is no longer the standard for determining when an accused's sixth amendment right to counsel attaches based on *Rothgery* and that it was improper for the police to hold him for eight days without bringing him before a judicial officer. However, as we explain below, a delay in holding defendant prior to arraignment, without more, is insufficient to trigger attachment of defendant's sixth amendment right to counsel in the absence of an appearance before a judicial officer.

■ In *Rothgery*, the United States Supreme Court revisited the issue of when and under what circumstances attachment occurs. The sixth amendment of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to have the Assistance of Counsel for his defence." U.S. Const., amend. VI. The Supreme Court has held that an accused's sixth amendment right is limited by the terms of the amendment and "does not attach until a prosecution is commenced." *McNeil v. Wisconsin*, 501 U.S. 171, 175, 115 L. Ed. 2d 158, 166, 111 S. Ct. 2204, 2207 (1991); *Moran v. Burbine*, 475 U.S. 412, 430, 89 L. Ed. 2d 410, 427, 106 S. Ct. 1135, 1145 (1986). For purposes of the right to counsel, the Supreme Court has identified commencement of a criminal prosecution as " ' "the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." ' " *Rothgery*, 554 U.S. at 198, 171 L. Ed. 2d at 374, 128 S. Ct. at 2583, quoting *United States v. Gouveia*, 467 U.S. 180, 188, 81 L. Ed. 2d 146, 154, 104 S. Ct. 2292, 2297 (1984), quoting *Kirby v. Illinois*, 406 U.S. 682, 689, 32 L. Ed. 2d 411, 417, 92 S. Ct. 1877, 1882 (1972) (plurality op.). The high court has acknowledged that the point at which the government has committed itself to prosecute, " 'the adverse positions of government and defendant have solidified,' " and the accused " 'finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.' " *Rothgery*, 554 U. S. at 198, 171 L. Ed. 2d at 374, 128 S. Ct. at 2583, quoting *Kirby*, 406 U.S. at 689, 32 L. Ed. 2d at 418, 92 S. Ct. at 1882.

Prior to *Rothgery*, *McNeil*, and *Moran*, the United States Supreme Court held that the right to counsel attaches at the initial appearance before a judicial officer. *Michigan v. Jackson*, 475 U.S. 625, 629 n.3, 89 L. Ed. 2d 631, 638 n.3, 106 S. Ct. 1404, 1408 n.3 (1986); *Brewer v. Williams*, 430 U.S. 387, 398, 51 L. Ed. 2d 424, 436, 97 S. Ct. 1232, 1239 (1977). The Supreme Court stated in its discussion of sixth amendment attachment principles in *Rothgery* that the rulings in *Brewer* and *Jackson* focused on arraignment before a judge, even if preliminary in nature, as being key in the attachment analysis. *Rothgery*, 554 U.S.

at 197, 171 L. Ed. 2d at 374, 128 S. Ct. at 2583. In *Brewer*, a warrant was issued for the defendant, who later surrendered to the police. He was subsequently arraigned before a judge, advised of his *Miranda* rights and detained in jail. *Brewer*, 430 U.S. at 391, 51 L. Ed. 2d at 432, 97 S. Ct. at 1236. After a preliminary arraignment, and before an indictment had issued, police obtained incriminating admissions that ultimately led to an indictment for first degree murder. *Brewer*, 430 U.S. at 393, 51 L. Ed. 2d at 433, 97 S. Ct. at 1237. The *Brewer* Court held that the defendant's right had clearly attached because "[a] warrant had been issued for his arrest, he had been arraigned on that warrant before a judge in a *** courtroom, and he had been committed by the court to confinement in jail." *Brewer*, 430 U.S. at 399, 51 L. Ed. 2d at 436, 97 S. Ct. at 1239-40. Based on those facts, the Court found the defendant's sixth amendment right to counsel had attached and it was "clear" that the defendant "was deprived of *** the right to the assistance of counsel." *Brewer*, 430 U.S. at 397-98, 51 L. Ed. 2d at 436, 97 S. Ct. at 1239.

In *Jackson*, the issue before the Court was whether the right to counsel attached at the initial appearance and the Supreme Court held that it did. *Jackson*, 475 U.S. at 633, 89 L. Ed. 2d at 640, 106 S. Ct. at 1409. The *Jackson* case was a consolidated matter, where the State conceded that one respondent's arraignment represented the initiation of formal legal proceedings, but, for another, it was not because the first arraignment was preliminary in nature and the ultimate determination on the pursuit of a felony indictment would occur in a formal arraignment pursuant to Michigan law. *Jackson*, 475 U.S. at 630, 89 L. Ed. 2d at 637, 106 S. Ct. at 1408. The State in the *Jackson* case argued that sixth amendment rights did not attach at the preliminary arraignment because it was not determinative of the State's commitment to pursue charges against an accused and the accused's rights were adequately protected under the fifth amendment. *Jackson*, 475 U.S. at 633, 89 L. Ed. 2d at 640-41, 106 S. Ct. at 1409.

The *Rothgery* Court's response to the argument in *Jackson* was clear where it stated:

> "We flatly rejected the distinction between initial arraignment and arraignment on the indictment, the State's argument being 'untenable' in light of the 'clear language in our decisions about the significance of arraignment.' [Citation.] The conclusion was driven by the same considerations the Court had endorsed in *Brewer*: by the time a defendant is brought before a judicial officer, is informed of a formally lodged accusation, and has restrictions imposed on his liberty in aid of the prosecution, the State's relationship with the defendant has become solidly adversarial. And that is

just as true when the proceeding comes before the indictment (in the case of the initial arraignment on a formal complaint) as when it comes after it (at an arraignment on an indictment)." *Rothgery,* 554 U.S. at 202, 171 L. Ed. 2d 376-77, 128 S. Ct. at 2586.

Over time, the *Jackson/Brewer* rule further evolved through its application by the individual states. *Rothgery,* 554 U.S. at 206, 171 L. Ed. 2d at 379-80, 128 S. Ct. at 2588-89. The standard became whether or not the State's prosecutor undertook significant involvement in prosecuting criminal charges prior to an indictment. See *People v. Young,* 153 Ill. 2d 383, 404 (1992); *People v. Hayes,* 139 Ill. 2d 89, 125 (1990); *People v. Wilson,* 116 Ill. 2d 29, 50-51 (1987); *People v. Owens,* 102 Ill. 2d 88, 101 (1984) (concluding that an adversarial criminal proceeding has not begun until the prosecution officers are aware of and involved in the prosecution of the accused). The *Rothgery* Court held "[u]nder this standard of prosecutorial awareness, attachment depends not on whether a first appearance has begun adversary judicial proceedings, but on whether the prosecutor had a hand in starting it. That standard is wrong." *Rothgery,* 554 U.S. at 206, 171 L. Ed. 2d at 379, 128 S. Ct. at 2588. Furthermore, beyond its broad statement that certain federal circuits and individual states had been incorrectly applying the prosecutorial involvement standard, it specifically declared that the standard to be applied to determine when a criminal prosecution commences must be uniform throughout the circuits and individual states. *Rothgery,* 554 U.S. at 207, 171 L. Ed. 2d at 379, 128 S. Ct. at 2588 (holding that "what counts as a commitment to prosecute is an issue of federal law unaffected by allocations of power among state officials under a State's law"), citing *Moran,* 475 U.S. at 429 n.3, 89 L. Ed. 2d at 426 n.3, 106 S. Ct. 1145 n.3 (holding that "the type of circumstances that would give rise to the right would certainly have a federal definition").

Under the federal standard reaffirmed in *Rothgery,* "an accusation filed with a judicial officer is sufficiently formal, and the government's commitment to prosecute it sufficiently concrete, when the accusation prompts arraignment and restrictions on the accused's liberty to facilitate the prosecution." *Rothgery,* 554 U.S. at 207, 171 L. Ed. 2d at 380, 128 S. Ct. at 2589, citing *Jackson,* 475 U.S. at 629, 89 L. Ed. 2d at 638, 106 S. Ct. at 1407; *Brewer,* 430 U.S. at 399, 51 L. Ed. 2d at 436, 97 S. Ct. at 1240; *Kirby,* 406 U.S. at 689, 32 L. Ed. 2d at 417, 92 S. Ct. at 1882. Following such acts, an accused is " 'faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law' that define his capacity and control his actual ability to defend himself against a formal accusation that he is a criminal." *Rothgery,* 554 U.S. at 207, 171 L. Ed. 2d at 380,

128 S. Ct. at 2589, quoting *Kirby*, 406 U.S. at 689, 32 L. Ed. 2d at 417, 92 S. Ct. at 1882. Moreover, the Supreme Court acknowledged that " 'it would defy common sense to say that a criminal prosecution has not commenced against a defendant who, perhaps incarcerated and unable to afford judicially imposed bail, awaits preliminary examination on the authority of a charging document filed by the prosecutor, less typically by the police, and approved by a court of law'. *** All of this is equally true whether the machinery of prosecution was turned on by the local police or the state attorney general." *Rothgery*, 554 U.S. at 208, 171 L. Ed. 2d at 380, 128 S. Ct. at 2589, quoting J. Grano, *Rhode Island v. Innis: A Need to Reconsider the Constitutional Premises Underlying the Law of Confessions*, 17 Am. Crim. L. Rev. 1, 31 (1979).

While we agree with defendant that the Supreme Court in *Rothgery* has dispensed with the "prosecutorial awareness" standard that was previously applied in Illinois and other jurisdictions, it did not obviate presentment before a judicial officer as a trigger to attachment of the sixth amendment right to counsel. Defendant argues that the events which occurred prior to the lineup, such as the police obtaining a warrant to arrest and holding him on one million dollars' bond, were sufficient to indicate the commencement of formal criminal proceedings against defendant, even though he had not appeared before a judicial officer. However, even though the delay in bringing defendant before a judge was unusual and inconsistent with section 109—1 of the Code, we do not agree that attachment occurred here by virtue of the delay in arraigning defendant.

Defendant asserts that under Illinois and federal law, arraignment was prompted under the facts in his case. See *Rothgery*, 554 U.S. at 207, 171 L. Ed. 2d at 380, 128 S. Ct. at 2589 ("an accusation filed with a judicial officer is sufficiently formal, and the government's commitment to prosecute it sufficiently concrete, when the accusation *prompts* arraignment and restrictions on the accused's liberty to facilitate the prosecution" (emphasis added)) (citing *Jackson*, 475 U.S. at 629, 89 L. Ed. 2d at 638, 106 S. Ct. at 1407; *Brewer*, 430 U.S. at 399, 51 L. Ed. 2d at 436, 97 S. Ct. at 1240, and *Kirby*, 406 U.S. at 689, 32 L. Ed. 2d at 411, 92 S. Ct. at 1882). Also, section 109—1 of the Code provides, in pertinent part:

> "A person arrested with or without a warrant shall be taken without unnecessary delay before the nearest and most accessible judge in that county, except when such county is a participant in a regional jail authority, in which event such person may be taken to the nearest and most accessible judge, irrespective of the county where such judge presides, and a charge shall be filed." 725 ILCS 5/109—1 (West 2002).

The State has not addressed the issue of defendant's prolonged detention nor has it given any explanation as to why eight days is not considered an "unnecessary delay" other than to state that defendant produced no evidence to show that it was not his decision to waive arraignment. However, in all of the relevant cases cited by the parties, including *Rothgery*, where a sixth amendment right to counsel was found to have attached, the accused enjoyed some type of presentation to a judicial officer. Defendant does not argue and the record does not support an argument that the police intentionally delayed presenting him to a judicial officer for the purpose of preventing attachment. Even though we agree that "arraignment was prompted," as explained in *Rothgery*, and defendant should have been brought before a judge, there is no authority of which we are aware that allows for "constructive attachment," as defendant urges here, due to a delay in arraigning an accused. We cannot say that attachment occurred in the absence of a formal judicial proceeding given the facts in this case. As a result, defendant was not entitled to counsel at his pretrial lineup. See *People v. Garrett*, 179 Ill. 2d 239, 249 (1997). Accordingly, because defendant's right to counsel under the sixth amendment had not attached at the time of his lineup, he was not entitled to assistance thereof and no violation of the right occurred.

## IV. Right to Counsel of Choice

The sixth amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to have the Assistance of Counsel for his defence." U.S. Const., amend. VI; *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144, 165 L. Ed. 2d 409, 416, 126 S. Ct. 2557, 2561 (2006); *Wheat v. United States*, 486 U.S. 153, 159, 100 L. Ed. 2d 140, 148, 108 S. Ct. 1692, 1697 (1988). Another dimension contemplated by the sixth amendment right to counsel that we now address is the right of a defendant, who does not otherwise require appointed counsel, to choose who will represent him. *Gonzalez-Lopez*, 548 U.S. at 144, 165 L. Ed. 2d at 416, 108 S. Ct. at 2561. Although the United States Constitution guarantees a criminal defendant the right to the assistance of the counsel of his choice, that right is subject to certain limits. *Wheat v. United States*, 486 U.S. 153, 159, 100 L. Ed. 2d 140, 148-49, 108 S. Ct. 1692, 1697 (1988). Among those limits is a trial court's "substantial latitude" to refuse to allow a defendant to waive his chosen counsel's actual or potential conflict of interest. *Wheat*, 486 U.S. at 163, 100 L. Ed. 2d at 151, 108 S. Ct. at 1699. The circuit courts require broad latitude because they must decide whether a conflict exists and, if so, whether to accept a defendant's waiver before trial, when the "likelihood and dimensions of nascent conflicts of interest

are notoriously hard to predict, even for those thoroughly familiar with criminal trials." *Wheat*, 486 U.S. at 162-63, 100 L. Ed. 2d at 151, 108 S. Ct. at 1699.

For purposes of review, we are mindful that the circuit court is in the best position to weigh and evaluate the facts and circumstances and to weigh the interests of all parties involved in the conflict analysis, and its decisions will not be disturbed absent an abuse of discretion. *People v. Ortega* 209 Ill. 2d 354, 360 (2004); *People v. Holmes*, 141 Ill. 2d 204, 223 (1990). On the other hand, " '[a] reviewing court must look to the criteria on which the trial court should rely to determine if the trial court abused its discretion.' " *Ortega*, 209 Ill. 2d at 360, quoting *Boatmen's National Bank of Belleville v. Martin*, 155 Ill. 2d 305, 314 (1993). The *Ortega* court further stated that "a trial court abuses its discretion if it fails to apply the proper criteria when it weighs the facts, and our inquiry must consider both the legal adequacy of the way the trial court reached its result as well as whether the result is within the bounds of reason." *Ortega*, 209 Ill. 2d at 360. This is not to say that any "magic words" or formal findings of fact and statements of reasons are required; however, the circuit court must make a record adequate to allow meaningful review of its exercise of discretion. *Ortega*, 209 Ill. 2d at 360, citing *People v. M.D.*, 101 Ill. 2d 73, 84 (1984). The review principles stated in *Ortega*, *Holmes* and *M.D.*, strike a balance between protecting a defendant's constitutional right to counsel of choice and the rationale that trial courts must have discretion in this area. *Ortega*, 209 Ill. 2d at 360-61; *Holmes*, 141 Ill. 2d at 223; *M.D.*, 101 Ill. 2d at 84.

■ Our supreme court in *Ortega* and *Holmes* addressed the procedure for the circuit courts in deciding the defendant's right to choice of counsel. The court in *Ortega* stated:

> "A trial court may exercise its discretion to deny a defendant's right to counsel of choice only if it could reasonably find that defense counsel has a specific professional obligation that actually does conflict or has a serious potential to conflict with defendant's interests. [Citation.] If the court has grounds to find at least a serious potential for conflict, it must then go on to consider the interests threatened by the conflict or potential conflict." *Ortega*, 209 Ill. 2d at 361.

Illinois courts recognize a presumption in favor of defendant's counsel of choice and must decide whether the interests threatened by the conflict or potential conflict are serious enough to overcome the presumption. *Ortega*, 209 Ill. 2d at 361; *Holmes*, 141 Ill. 2d at 223, quoting *Wheat*, 486 U.S. at 164, 100 L. Ed. 2d at 152, 108 S. Ct. at 1700. Thus, the question becomes whether the interests threatened by

the conflict or potential conflict are weighty enough to overcome the presumption in favor of allowing defendant to choose his own counsel. *Ortega*, 209 Ill. 2d at 361; *Holmes*, 141 Ill. 2d at 228.

█ In *Ortega*, our supreme court articulated four factors to be considered by the circuit court when deciding whether the presumption in favor of defendant's choice of counsel was overcome. They are: (1) the defendant's interest in having the undivided loyalty of counsel; (2) the State's right to a fair trial in which defense counsel acts ethically and does not use confidential information to attack a State witness; (3) the appearance of impropriety should the jury learn of the conflict; and (4) the probability that continued representation by counsel of choice will provide grounds for overturning a conviction. *Ortega*, 209 Ill. 2d at 361-62; *Holmes*, 141 Ill. 2d at 226-27. The *Ortega* court noted that the four factors mentioned above are not an exclusive list and the circuit court should seek to fairly consider all the interests that are affected by a conflict in a given case. *Ortega*, 209 Ill. 2d at 362. " '[T]he decision to disqualify an attorney in a criminal case requires an evaluation of the interests of the defendant, the government, the witness and the public in view of the circumstances of each particular case.' " *Ortega*, 209 Ill. 2d at 362, quoting *United States v. O'Malley*, 786 F.2d 786, 790 (7th Cir. 1986).

Defendant asserts that the circuit court erroneously deprived him of counsel of his choice without first identifying the conflict or potential conflict when it denied co-counsel Himel's motion for leave to file his appearance. Also, defendant argues that even if the potential for a conflict existed, the circuit court did not weigh the appropriate factors mandated by our supreme court or sufficiently state a basis for finding a conflict or the serious potential for a conflict in the record. Defendant admits that the circuit court expressed concern about David Jennings, who appeared on the State's list of potential witnesses and whom co-counsel previously had represented. Defense counsel informed the court that the State indicated that it would not call Jennings and the State did not refute counsel's statement nor did it actually call Jennings as a witness at trial. According to defendant, the circuit court based its ruling on the potential that the State could call Jennings as a witness and perhaps the victim's brothers, whom defense co-counsel had represented in the past.

Defendant's argument, in summary, is that a presumption exists in favor of his choice of co-counsel and the State bears the burden of production and persuasion to prove otherwise. The State told defense counsel that it would not call the individuals co-counsel inquired of, it did not correct defense counsel when he stated this to the court and in fact did not call anyone who had been represented by co-counsel.

Furthermore, because the circuit court did not weigh the factors laid out in *Ortega*, it failed to engage in the proper analysis and abused its discretion. According to defendant, under the circumstances in this case, the State has failed to carry its burden and the circuit court failed to engage in any analysis or create a record from which we could determine whether the circuit court's decision was correct.

The State responds to defendant's right to counsel violation claim by arguing, among other things, that the State had proved the existence of a potential conflict sufficient to overcome defendant's presumption to counsel of his choice and the record supports the circuit court's decision to deny co-counsel's motion for leave to file his appearance. Specifically, the State points to the fact that defense co-counsel admitted that he previously represented David Jennings, the victim's cousin, and a potential witness listed on the State's witness list. Attorney Himel also admitted that he, either currently or previously, represented Ajani, Sundeyatta, James, David and Odigny Brown, all of whom are either brothers or cousins of the victim, Aramein Brown. After explaining how Attorney Himel either represented or had previously represented certain relatives of the victim, the State argued as follows:

> "It's our contention, Judge, that clearly what they want to do in this case is the defense is blaming the Brown faction for basically making up this case and putting a case on [defendant]. Whereas in here, you have an attorney that is representing the Browns, how can he clearly, Judge, a couple of things, how can he say that there is no conflict when he represents the Browns? Basically he's going along acting as co-counsel in a case where he's blaming his own clients for making up a case against [defendant].
>
> And furthermore, Judge, it's our belief that he's using confidential information that he obtained as a result of his representation not only of [Ajani] but all of the Brown family. And that puts us at an unfair trial advantage. \*\*\*
>
> Judge I would add to that, a couple of other things. He represented David Jennings and actually brought Jennings to the DEA [Drug Enforcement Agency] authorities where he was talked to about the murder of Aramein Brown, he was present for the interview, he was representing him and David Jennings told the DEA that [defendant] was the shooter in that case."

In its denial of defendant's motion for leave to file the appearance of co-counsel, the circuit court stated:

> "Because the possibility exists that they could [call] them and Mr. Himel is coming in today on the day the case is set for trial, asking leave to file his appearance, that leave is going to be respectfully denied. His name appears on the witness list, there is a potential conflict and while Mr. White may, in your opinion, waive

that right, at this point based on what I've heard and I don't want to hear about what Mr. Himel knows about his case and his involvement with the DEA or the people on South Dearborn with regards to any of these witnesses and their involvement, I'm ending this conversation right now."

 While the record does not show that the circuit court engaged in a specific evaluation of the four *Ortega* factors, we disagree that the record was insufficient to show that the court considered the relevant interests and that the State successfully carried its burden in overcoming the presumption that defendant is entitled to the counsel of his choice. With regard to the first factor, whether counsel will have divided loyalties, counsel stated on the record that he then represented a number of the victim's family members. Co-counsel further conceded that if the witnesses listed, including David Jennings, were required to testify, it would be "problematic." In addition, Ajani Brown, who had been represented by attorney Himel, was implicated by Martina Brewer as the one who threatened her and her family with harm if she did not falsely identify defendant to the police. We find sufficient evidence of divided loyalties considering that co-counsel previously represented Jennings, who allegedly identified defendant to the federal authorities as the shooter, and also represented multiple family members of the murder victim who were also eyewitnesses in this case.

Relative to the State's right to a fair trial, the second *Ortega* factor, the State claimed that co-counsel was the Brown's family attorney for all intents and purposes and would have acquired privileged or confidential information that could have been used against the State. This was an obvious concern from the State's perspective because attorney Himel indicated that he had represented many members of the Brown family in criminal matters and the alleged motive for the instant murder was a dispute over the two families' illegal drug enterprise. We, like the circuit court below, do not find it necessary to know any additional specific facts regarding what attorney Himel learned from his representation of the Brown family members because such disclosure could compromise his professional obligations to those individuals or the obligations he had to defendant. The fact that attorney Himel defended multiple members of the Brown family in criminal matters that may be connected to the case before us, is sufficient, in our view, to raise serious concerns for the State based on what he may have learned in the course of representing the Browns.

We do not find the third factor to be relevant here because defendant was tried in a bench trial; however, the fourth factor, whether continued representation could result in reversal on appeal,

is particularly relevant to the analysis because attorney Himel would apparently have conflicting obligations by virtue of his representation of Jennings and defendant. Himel previously represented and accompanied Jennings to a meeting with the federal authorities where Jennings, as mentioned above, allegedly identified defendant as the shooter. The fact that he represented Jennings, who identified defendant in the same murder charge that Himel now seeks to defend, puts him in a precarious balancing act if Jennings were to be called. Even though Jennings was not ultimately called as a witness, we find it important to note that the circuit court is required to take all of the information received from the parties and calculate, before the trial commences, how each piece of evidence will fit into a trial about which the judge knows very little. The court must consider all the angles, obstacles, conditions and potential twists and turns in future evidence and testimony. Considering the fact that this most important decision-making process occurred before any theory on the case is developed and, in this case, on the day trial was to commence, we cannot say that the circuit court abused its discretion in denying co-counsel's motion for leave to file an appearance. We also find that evidence was sufficient to overcome the presumption in favor of defendant's counsel of choice and also supported a finding that serious potential for a conflict existed.

## CONCLUSION

For the foregoing reasons, we hold that barring defense counsel from the viewing room is a violation of the sixth amendment right to assistance of counsel under *Wade* and *Gilbert*; however, because defendant's sixth amendment right to counsel had not yet attached, reversal is not warranted. Further, the circuit court did not abuse its discretion in denying co-counsel's motion for leave to file his appearance because the State produced sufficient evidence to overcome the presumption in favor of defendant's chosen counsel and support a finding that a serious potential for conflict existed. Finally, although the evidence used to convict defendant in this case was closely balanced, defendant did not challenge the sufficiency of the evidence on appeal and we will not consider it *sua sponte*. Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

JOSEPH GORDON and McBRIDE, JJ., concur.